2015-1799

# United States Court of Appeals for the Federal Circuit

CLOUDING CORP.,

Appellant,

v.

UNIFIED PATENTS, INC.,
SAP AMERICA, INC.,

Appellees.

Appeal from the United States Patent and Trademark Office
Patent Trial and Appeal Board in Nos. IPR2013-00586 & IPR2014-00306

## APPELLANT'S BRIEF

FILED ON BEHALF OF: APPELLANT, CLOUDING CORP.

Tarek N Fahmi
ASCENDA LAW GROUP, PC
333 W San Carlos St., Suite 200
San Jose, CA 95110
Telephone: (408) 799-0612
tarek.fahmi@ascendalaw.com

*Counsel for Appellant*

# CERTIFICATE OF INTEREST AND

# CORPORATE DISCLOSURE STATEMENT

Counsel for Appellant-Patent Owner, Clouding Corp., certifies the following:

1. The full name of every party or amicus represented by me is: **Clouding Corp.**

2. The name of the real party in interest represented by me is: **Clouding Corp.**

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: **Marathon Patent Group, Inc.**

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

> Tarek N. Fahmi
> ASCENDA LAW GROUP, PC
> 333 W. San Carlos Street, Suite 200
> San Jose, CA 95110

Date: September 4, 2015

_/s/Tarek N. Fahmi_____
Tarek N. Fahmi
Attorney for Appellant

ii

# TABLE OF CONTENTS

I.    STATEMENT OF RELATED CASES ............................................................ 1

II.   JURISDICTIONAL STATEMENT ................................................................. 1

III.  STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................... 2

IV.   STATEMENT OF THE CASE ..................................................................... 3

    A. The '799 Patent – File Synchronization Using a Signature List. ........................ 4

    B. Williams – U.S. Patent 5,990,810. .................................................... 10

    C. Balcha – U.S. Patent 6,233,589. ....................................................... 14

    D. Miller – U.S. Patent 5,832,520. ....................................................... 19

    E. Freivald – U.S. Patent 5,898,836. .................................................... 20

    F. Patent Owner's Contingent Motion to Amend. ................................. 21

V.    SUMMARY OF THE ARGUMENT .......................................................... 23

VI.   ARGUMENT ............................................................................................ 28

    A. Standard of Review. ......................................................................... 28

    B.    By Conflating Retain-by-Default Synchronization Schemes and Discard-by-Default Schemes, the Board Read Out the Requirements of Claims 1, 12, 23, 24, 30, and 31 in Order to Find Anticipation by Williams. ........................ 29

    C.    The Board's Faulty Analysis of Claims 37 and 42 Led to an Erroneous Conclusion of Anticipation by Williams. ............................................... 35

    D.    The Board's Flawed Decisions Regarding Williams Led to the Erroneous Conclusion that Claims 5-10 and 16-21 are Obvious in View of Williams When Considered in Combination with Miller. ............................................. 39

E.   The Board's Error When Construing "Determining" Led to Claims 37 and 42 Being Found Anticipated by Balcha. ...................................................................... 42

F.   The Same Error Affects the Board's Conclusions of Obviousness Over Balcha and Freivald. ...................................................................... 45

G.   The Board Erred in Concluding that Claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31 Are Obvious Over Balcha When Considered in Combination with Miller. ...................................................................... 47

H.   Claims 6-8 and 17-19 Remain Patentable Over Balcha Even When Considered in Combination with Miller and Freivald. ........................................................... 52

I.   The Board Failed to Credit Patent Owner's Discussion of the Prior Art as Indicative of the Level of Ordinary Skill in the Art. ............................................... 54

J.   The Board's Failed to Acknowledge Patent Owner's Assertions of Patentability Over the Prior Art Generally, and Instead Addressed only the Assertions Over the Prior Art Cited by Petitioner. ...................................................................... 56

VII.   CONCLUSION ........................................................................... 60

VIII.   ADDENDUM ......................................................................... A-1

IX.   PROOF OF SERVICE ............................................................... A-2

X.   CERTIFICATE OF COMPLIANCE ......................................... A-3

# TABLE OF AUTHORITIES

## CASES

*Bayer Schering Pharm. AG v. Barr Labs., Inc.*,
  575 F.3d 1341 (Fed. Cir. 2009) (Newman, J., dissenting) .................................... 51

*Belkin Int'l, Inc. v. Kappos*,
  696 F.3d 1379 (Fed. Cir. 2012) ................................................... 28, 40

*CFMT, Inc. v. Yieldup Intern. Corp.*,
  349 F.3d 1333 (Fed. Cir. 2003) ........................................................ 47

*Chore-Time Equipment, Inc. v. Cumberland Corp.*,
  713 F.2d 774 (Fed. Cir. 1983) ......................................................... 54

*Idle Free Systems, Inc. v. Bergstrom, Inc.*,
  Case IPR2012-00027 (P.T.A.B. June 11, 2013) ............................................ 56, 59

*In re Baxter Int'l, Inc.*,
  678 F.3d 1357 (Fed. Cir. 2012) ........................................................ 29

*In re Fine*,
  837 F.2d 1071 (Fed. Cir. 1988) ........................................................ 42

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ........................................................ 28

*In re Gleave*,
  560 F.3d 1331 (Fed. Cir. 2009) ........................................................ 28

*In re Kotzab*,
  217 F.3d 1365 (Fed. Cir. 2000) ........................................................ 29

*In re Mettke*,
  570 F.3d 1356 (Fed. Cir. 2009) ........................................................ 29

*In re NTP, Inc.*,
  654 F.3d 1279 (Fed. Cir. 2011) ........................................................ 28

*In re Robertson*,
  169 F.3d 743 (Fed. Cir. 1999) ............................................................. 34

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ..................................................................... 48, 51

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
  545 F.3d 1359 (Fed. Cir. 2008) ....................................... 24, 35, 44, 59

*Okajima v. Bourdeau*,
  261 F.3d 1350 (Fed. Cir. 2001) ......................................................... 54

*Richardson v. Suzuki Motor Co.*,
  868 F.2d 1226 (Fed. Cir. 1989) ......................................................... 44

*Stratoflex, Inc. v. Aeroquip Corp.*,
  713 F.2d 1530 (Fed. Cir. 1983) ......................................................... 59

*Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc.*,
  135 S. Ct. 831 (2015) ........................................................................ 28

*Verdegaal Bros. v. Union Oil Co. of California*,
  814 F.2d 628 (Fed. Cir. 1987) ........................................................... 38

*W.L. Gore & Associates, Inc. v. Garlock, Inc.*,
  721 F.2d 1540 (Fed. Cir. 1983), *cert. denied*, 469 U.S. 851 (1984) ............... 40, 50

## STATUTES

28 U.S.C. § 1295(a)4(A) ............................................................................. 2

35 U.S.C. § 141(c) ................................................................................. 1, 2

35 U.S.C. § 6(c) ....................................................................................... 1

REGULATIONS

37 C.F.R. § 42.24(a)(1)(v) (2012) ........................................................................... 23

37 C.F.R. § 90.3(a) ................................................................................................... 1

## I.   STATEMENT OF RELATED CASES

There are no other appeals in or from the proceedings below that were previously before this or any other appellate court. U.S. Patent 6,738,799 (the "'799 Patent") is currently at issue in *Clouding Corp. v. EMC Corporation et al.*, Case No. 1:14-cv-01178 (DED).

## II.   JURISDICTIONAL STATEMENT

This is an appeal under 35 U.S.C. § 141(c) of a final written decision of the USPTO Patent Trial and Appeal Board ("Board") in *Inter Partes* Review No. 2013-00586 and IPR2014-00306,[1] finding claims 1, 5-10, 12, 16-21, 23, 24, 30, 31, 37, and 42 of the '799 Patent unpatentable.[2] Patent Owner timely filed and served its Notice of Appeal within the sixty three-day time period established by 37 C.F.R. § 90.3(a) on May 15, 2015. The Board had jurisdiction over the matter below under 35 U.S.C. § 6(c), and this Court has sole jurisdiction over this

_____

[1] The two proceedings were joined pursuant to an Order of the Board on Mar. 20, 2015. A-272 – A-275.

[2] *Unified Patents, Inc. et al. v. Clouding Corp.*, IPR2013-00586, Final Written Decision, Paper 37 at 40 (P.T.A.B. Mar. 19, 2015) (A-40) (hereinafter "Final Written Decision").

appeal under 28 U.S.C. § 1295(a)4(A) and 35 U.S.C. § 141(c).

## III.    STATEMENT OF ISSUES PRESENTED FOR REVIEW

The issues presented for review are:

A.    Whether the Board erred in finding claims 1, 12, 23, 24, 30, 31, 37, and 42 anticipated under 35 U.S.C. § 102(e) by U.S. Patent 5,990,810 ("Williams")?

B.    Whether the Board erred in finding claims 5–10 and 16–21 unpatentable under 35 U.S.C. § 103(a) as obvious over Williams and U.S. Patent 5,832,520 ("Miller")?

C.    Whether the Board erred in finding claims 37 and 42 anticipated under 35 U.S.C. § 102(e) by U.S. Patent 6,233,589 ("Balcha")?

D.    Whether the Board erred in finding claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31 unpatentable under 35 U.S.C. § 103(a) as obvious over Balcha and Miller?

E.    Whether the Board erred in finding claims 6–8 and 17–19 unpatentable under 35 U.S.C. § 103(a) as obvious over Balcha, Miller, and U.S. Patent 5,898,836 ("Freivald")?

F.    Whether the Board erred in finding claims 37 and 42 unpatentable under

35 U.S.C. § 103(a) as obvious over Balcha and Freivald?

G.    Whether the Board erred in denying Patent Owner's Motion to Amend substituting claim 47 for claim 42?


## IV.    STATEMENT OF THE CASE

This case arose from separate petitions filed under 35 U.S.C. §§ 311-319 by Unified Patents, Inc. and SAP America, Inc.,[3] seeking *inter partes* review ("IPR") of various claims of the '799 Patent.[4] Subsequent to institution and joinder of the two IPR proceedings, Patent Owner, Clouding Corp., filed a Response to the petitions and a Contingent Motion to Amend.[5] Petitioners filed a Reply to the Patent Owner's Response and an Opposition to the Contingent Motion to Amend. Patent Owner filed a Reply to Petitioners' Opposition to the Motion to Amend. An oral hearing was held on October 16, 2014.

In a Final Written Decision on March 19, 2015, the Board held that all of the challenged claims of the '799 Patent were unpatentable. Specifically, claims 1, 12,

---

[3] A-272 – A-275.

[4] Final Written Decision at 2, 40 (A-2, A-40).

[5] The Motion to Amend sought to substitute a new claim 47 for original claim 42, contingent upon the Board's finding claim 42 to be unpatentable. A-325.

23, 24, 30, 31, 37, and 42 were found anticipated by Williams; claims 5–10 and 16–21 were found obvious over Williams and Miller; claims 37 and 42 were found to be anticipated by Balcha; claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31 were found obvious over Balcha and Miller; claims 6–8 and 17–19 were found obvious over Balcha, Miller, and Freivald; and claims 37 and 42 were found obvious over Balcha and Freivald. In the same Decision, the Board denied Patent Owner's Motion to Amend, holding that, "Patent Owner has not met its burden of showing the patentability of the proposed substitute claim 47 over the prior art."[6] This appeal followed.

### A. The '799 Patent – File Synchronization Using a Signature List.

The '799 Patent describes systems and methods for generating update files that permit a computer to generate a current version of a file from a copy of an earlier version of that file.[7] Such a process is useful for synchronizing local copies of files maintained at different computer systems and/or copies stored on network drives.[8]

---

[6] Final Written Decision at 39-40 (A39 – A-40).

[7] *'799 Pat.* at Abstract; col. 3, ll. 45-49 (A-47, A-62).

[8] *Id.* at col. 1, ll. 24-27 (A-61).



FIG. 2

To facilitate such synchronization, files are segmented and each segment is represented by a signature.[9] Signatures are representations of variable length segments of a subject file, which representations serve to identify the segments from which they are determined.[10] Differences between a current version of a file and an earlier version thereof are determined using these signatures.[11]



FIG. 3

---

[9] *Id.* at col. 8, ll. 7 *et seq.*; *and see* Fig. 3 (A-64, A-51).

[10] *Id.* at Fig. 4; col. 8, ll. 18-20, 29-54 (A-52, A-64).

[11] *See, e.g.*, *id.* at col. 10, ll. 5-14 and Fig. 10 (A-65, A-58).

Based on the differences between versions of a file, an update file (or difference file) is constructed.[12] The update file includes commands (e.g., copy, insert) that instruct a recipient computer as to how to construct the current version of the subject file from its earlier version thereof using data included in the update file.[13] Once created, the update file is provided to the recipient computer, for example via email.[14]



FIG. 10

Claims 1 and 37 of the '799 Patent are representative of the claims that were challenged in the underlying proceedings, and are reproduced below for convenience:

> 1. A method for a first computer to generate an update for transmission to a second computer that permits the second computer to generate a copy of a current version of a file comprised of a first plurality of file segments from a copy of an earlier version of the file comprised of a second plurality of file segments, such that each file segment

---

[12] *Id.* at col. 10:, ll. 66 – col. 11, ll. 50 (A-65 – A-66).

[13] *Id.* and *see* Fig. 11 (A-65 – A-66, A-59).

[14] *Id.* at col. 11, ll. 51-52 (A-66).

corresponds to a portion of its respective file, the method comprising the steps of: for each segment of the current version of the file,

(a) searching an earlier version of a signature list corresponding to an earlier version of the file for an old segment signature which matches a new segment signature corresponding to the segment;

(b) if step (a) results in a match, writing a command in the update for the second computer to copy an old segment of the second computer's copy of the earlier version of the file into the second computer's copy of the current version of the file, wherein the old segment corresponds to the segment for which a match was detected in step (a); and

(c) if step (a) results in no match, writing a command in the update for the second computer to insert a new segment of the current version of the file into the second computer's copy of the current version of the file;

wherein the new segment of the current version of the file is written into the update and the unchanged segment is excluded from the update; and

wherein steps (a) through (c) are performed by the first computer, without interaction with the second computer, in response to the first computer detecting a change between the current version of the file and the earlier version of the file.

37. A method for a first computer to provide updates for transmission to a second computer that permits the second computer to obtain most recent versions of files, the method comprising the steps of:

(a) determining whether the second computer has a latest version of a file, wherein said determining is performed by the first computer without interaction with the second computer;

(b) generating an update, if the second computer does not have a latest version of the file, wherein said generating is performed by the first computer without interaction with the second computer; and

(c) transmitting the update from the first computer to the second computer.

Altogether, claims 1, 5-10, 12, 16-21, 23, 24, 30, 31, 37, and 42 of the '799 Patent were challenged in the underlying petitions. Of the challenged claims, claims 1, 12, 23, 30, 37, and 42 are independent claims, with claims 1, 23, and 37 being method claims and claims 12, 30, and 42 being computer-readable media versions of claims 1, 23, and 37, respectively.

As noted above, claim 1 requires that certain commands be written in the update file. One such command is a "command . . . to copy an old segment of the [receiving] computer's copy of the earlier version of the file into the [receiving]

8

computer's copy of the current version of the file."[15] Similar requirements exist in independent claims 12, 23, and 30. Examples of such commands are illustrated in Fig. 11, reproduced below. Therefore, claims 1, 12, 23, and 30 are properly understood as



| UPDATE FILE FOR <FILENAME> | | |
|---|---|---|
| COPY | LOC(A1) | SIZE(A1) |
| INSERT | <CONTENTS OF B2> | |
| COPY | LOC(A3) | SIZE(A3) |
| INSERT | <CONTENTS OF B4> | |
| INSERT | <CONTENTS OF B5> | |
| COPY | LOC(A5) | SIZE(A5) |
| COPY | LOC(A6) | SIZE(A6) |

1101
1102
1103
1104
1105
1106
1107

1100

## FIG. 11

reciting the requirement of writing in the update file, a command that causes the second computer to duplicate information or data from an old segment of the second computer's copy of the earlier version of the file into the second computer's copy of the current version of the file, wherein the old segment corresponds to the segment for which a match was detected.[16]

The use of a "command to . . . copy" in an update file (as specified in claims 1, 12, 23, and 30) is a hallmark of a *discard–by-default* scheme, one of two methodologies for file synchronizations or backups. "Briefly, retain-by-default indicates that, when generating a new version of the file, each portion of the old version of the file is kept unless the update explicitly indicates removing that portion. Conversely, discard-by-default indicates that, when generating a new version of a file,

---

[15] *Id.* at Claim 1, col. 14, ll. 53-57; Claim 23, col. 16, ll. 61-65 (A-67, A-68).

[16] Decl. of Prasant Mohapatra, *Ex. 2009* at ¶ 13 (A-1815 – A-1816).

each portion of the old version of the file is discarded unless the update explicitly indicates keeping that portion."[17] While the end result of the two different file synchronization techniques may be the same, the approaches are opposites of one another insofar as how the receiving computer at which the replica of the subject file is instructed to create that replica.[18]

Claim 37 does not include the "command to . . . copy" language of claims 1, 12, 23, and 30, but does require both determining whether a second computer has a latest version of a file, and generating an update, if the second computer does not have a latest version of the file, wherein both the determining and generating operations are performed by the first computer without interaction with the second computer.

### B. Williams – U.S. Patent 5,990,810.

Williams describes a procedure for partitioning blocks of data into subblocks for ease of communicating and storing same.[19] Figure 25 of Williams illustrates the file backup process of interest in this proceeding and is reproduced below for convenience.

---

[17] Final Written Decision at 19-20 (A-19 – A-20).

[18] Decl. of Norman Hutchinson, *Ex. 1007* at ¶¶ 22-26 (A-888 – A-891).

[19] Williams at col. 1, ll. 7-10 (A-860).



In this illustration, E1 and E2 are two computers and a file X on computer E1 is to be backed up to computer E2, so that both E1 and E2 will have (or be able to reconstruct) the same version of the file. File Y represents a previously backup version of the file at computer E2.[20]

According to Williams,

> To perform the backup, E1 compares the hash of Y (stored in S) against the hash of X to see if X has changed. If X hasn't changed, there is no need to perform any further backup action. If X has changed, E1 partitions X into subblocks, and compares the hashes of these subblocks with the hashes in the shadow file S, so as to find all identical hashes. Identical hashes identify identical subblocks in Y that can be transmitted [to E2] by reference. E1 then

---

[20] *Id.* at col. 19, ll. 29–34, col. 19, l. 63 – col. 20, l. 2 (A-869).

> transmits the [incremental backup D] file as a mixture of
> raw subblocks and references to subblocks whose hashes
> appear in S and which are therefore known to appear as
> subblocks in Y.[21]

Then,

> To reconstruct X from Y and D (the incremental backup
> information being sent from E1), E2 partitions Y into
> subblocks [and] calculates the hashes of the subblocks . . . .
> [E2] then processes the incremental backup information [D
> by] copying subblocks that were transmitted raw and
> looking up the references either in Y or in the part of X
> already reconstructed.[22]

Thus, when a file is modified, computer E1's current version of the file,
referred to as X, differs in some respects from a previous version of that file. In other
words, each of the computers, E1 and E2, has a version of the same file, X and Y,
respectively. Williams then determines what information is necessary for computer E2
to generate a replica of X from Y, and sends that incremental backup information in a
file, D, from computer E1 to computer E2. Computer E2 subsequently may generate
a copy of file X by using its prior version of the file, Y, and the incremental backup

---

[21] *Id.* at col. 19, ll. 44-55 (A-869).

[22] *Id.* at col. 19, l. 66 – col. 20, l. 5 (A-869).

information file, D. The incremental backup information in D includes raw subblocks, which represents data not included in the previously saved version of X (i.e., Y) and references to subblocks that are included in Y.[23]

Williams is, therefore, concerned with an incremental backup system in which a file Y is updated to become a copy of X.[24] Any encoding in the incremental backup file, D, would not be to *copy*, or perform the action of copying segments from an old version of Y to a new version of Y, but rather to *modify* the old version of Y so it becomes a replica of X.[25] Such would be consistent with the stated goal of Williams and would not entail copying of segments of Y.[26] As no copying is needed, there would also be no need for an instruction to effect same to be written in file D.[27]

---

[23] *Ex. 2009* at ¶ 28 (A-1828 – A-1829).

[24] Williams at col. 19, ll. 31-33 (A-869).

[25] *Ex. 2009* at ¶ 28 (A-1828 – A-1829).

[26] Insofar as ephemeral copies of files or portions thereof may be duplicated in one or memories of a computer system during these operations, such duplication is not equivalent to a "command to copy" (or other instruction that causes the computer to duplicate information or data) that is written in the Williams D file. It is merely the mechanism by which a computer processor is required to operate on data. *Id.* at ¶ 29, fn. 3 (A-1829).

C. Balcha – U.S. Patent 6,233,589.

Balcha discloses sharing changes between two files wherein a change to one version of the file "should eventually be reflected in the other copy [of that file].[28]



FIG. 1

As explained by Balcha with reference to Figure 1, provided above:

> Each of servers 22 and 24 maintain a copy of a base file 21, 27, respectively and are interconnected via a network 26. Base files 21, 27 should be identical to one another and thus changes made to one copy should eventually be

---

[27] *Id.* at ¶ 28 (A-1828 – A-1829) Indeed, it is equally plausible that mere pointers, such as those taught by Balcha, could be used to identify existing subblocks in the Y file. Doing so would avoid the need for copy commands entirely and be entirely consistent with the goal of reducing the size of a difference file that needs to be communicated between computers.

[28] Balcha at col. 4, ll. 52-67 (A-777).

reflected in the other copy. A base signature file, as described in more detail herein, is generated on one of the servers 22, 24 and copied to the other server. The base signature file is maintained on server 22 as file 20, and maintained on server 24 as file 28. Either base file 21 or 27 can be modified at either server.

Upon detection of a modification to the file, the detecting server, for example server 22, uses the respective base signature file, for example, base signature file 20, to generate a new delta file, and communicates the delta file over network 26 to server 24. Server 24 then uses the delta file to update the base file 27, and recalculates the base signature file 28.[29]



FIG. 3

Balcha describes the process for reflecting the differences between two files (a base file and a revised file), within a so-called "delta file" with reference to Figure 3, shown here. In particular, the delta file is created based on a comparison of a base signature file

---

[29] *Id.* at col. 4, ll. 52-67 (A-777).

(which represents the base file), a revised signature file (which represents the revised file) and the revised file itself.[30] Conveniently, Balcha also provides examples of a base file, a base signature file, a revised file, a revised signature file and a resulting delta file:[31]

```
base file
    CRC values:   A      B      C      D      E      F
    base file:    ABCDE.FGHIJ.KLMNO.PQRST.UVWXY.Z
    base sig. file: A,B,C,D,E,F

    The base file is then modified and a
revised file created containing the following:

First Revised File Example
    CRC values:   A             C             E      F
    revised file: ABCDE.XYZ.KLMNO.PAABST.UVWXY.Z
    revised signature file: A, (3)C, (6)E,F
    delta file:   ins(5, 3, 'XYZ'), del(0, 5),
                  ins(5, 6, 'PAABST'), del(5, 5)
```

As shown, the delta file includes certain "primitives" (for "insert," "modify," and "delete"),[32] which can be used to generate a copy of the revised file from the delta

---

[30] *Id.* at col. 7, l. 46 – col. 8, l. 6 (A-779).

[31] *Id.* at col. 13, ll. 50 *et seq*. In this example, "the periods used to delineate certain characters are not part of the file itself, and are used merely to illustrate certain logical distinctions between groups of characters." *Id.* at col. 13, ll. 40-42 (A-782).

[32] *Id.* at col. 3, ll. 55-56 (A-777).

file. The operation of these primitives is explained, with reference to the above

example, at col. 14, ll. 5-19:[33]

```
Initial base file: ABCDE.FGHIJ.KLMNO.PQRST.UVWXY.Z
After primitive #1: ins(5, 3, 'XYZ'):
     ABCDE.XYZ.FGHIJ.KLMNO.PQRST.UVWXY.Z
After primitive #2: del(0, 5):
     ABCDE.XYZ.KLMNO.PQRST.UVWXY.Z
After primitive #3: ins(5,6, 'PAABST'):
     ABCDE.XYZ.KLMNO.PAABST.PQRST.UVWXY.Z
After primitive #4: del(5,5):
     ABCDE.XYZ.KLMNO.PAABST.UVWXY.Z
```

According to Balcha, the delta file requires that the base file

(ABCDE.FGHIJ.KLMNO.PQRST.UVWXY.Z) be first modified by inserting, at a

position 5 characters from the initial pointer position, a 3-character string, "XYZ."

Next, beginning at the then-current pointer position, a 5-character string is deleted.[34]

Thereafter, and beginning at a location 5 characters from the then-current pointer

position, a 6-character string, "PAABST" is inserted.[35] Finally, the pointer position is

---

[33] In this exposition, the "^" character indicates the position of a pointer in the base

file at which the corresponding primitive is applied. *Id.* at col. 13, l. 65 – col. 14, l. 1

(A-782).

[34] *Id.* at col. 14, ll. 5-19 (A-782).

[35] *Id.*

advanced 5 characters and a 5-charater string is deleted.[36] In this way, a new version of the old file is created wherein new data is added to the old version of the file via the "insert" primitive, undesired data is deleted from the old version of the file via the "delete" primitive, and data within the old version of the file is modified via the "modify" primitive.[37]

Thus, in the Balcha process, data within the old version of the file that is not modified or deleted remains in the new version of the file with no need to copy that information from the old version of the file to the new version of the file.[38] This then is a *retain-by-default* process and, consequently, Balcha has no need for and does not write a copy "primitive" (or any other instruction) into the delta file to effect the copying of data from the old version of the file into the new version of the file.[39]

---

[36] *Id.*

[37] *Id.*

[38] *Ex. 2009* at ¶21 (A-1822 – A-1823).

[39] *Id.*

### D. Miller – U.S. Patent 5,832,520.

Miller describes a procedure for revising large computer files using difference files or DIFF files – *i.e.,* files containing indications of the differences between the large computer files and a preexisting computer file.[40] An overview of that process is illustrated in Miller's Figure 1, shown here.

Miller's DIFF file includes primitives for "copy," "insert," and "insert/copy" operations, which impart directives for handling stings that appear in new and old copies of the subject file.[41] Importantly, from Miller's perspective, the DIFF file must indicate changes between the old file and



*FIG. 1*

the new file in a minimum number of bytes so that the DIFF file is the smallest such file possible.[42] Failing to use a file that was as small as possible would defeat Miller's objective.[43]

---

[40] Miller at col. 1, ll. 10-15 (A-799).

[41] *See, e.g.*, *id.* at Fig. 5A (A-791).

[42] *Id.* at col. 2, ll. 21-24, 31-33 (A-799).

[43] *Ex. 2009* at ¶ 24 (A-1824 – A-1825).

### E. Freivald – U.S. Patent 5,898,836.

Freivald describes a system in which users register to receive updates when content at various Web pages is changed.[44] In this system, registered Web pages are examined periodically to see if they have changed since a last check. When changes are noted, a server so notifies the user by way of email.[45] In an enhanced version of the service, users are allowed to specify portions of interest of Web pages so that they receive notices only when those portions of interest have changed.[46] Thus, Freivald is unconcerned with whether or not a subscribed client has a latest version of a Web page (or any version at all for that matter), and sends notifications whenever qualifying changes in a Web page have been detected, regardless of whether the modifications reflect the latest version of the file or not.[47]

---

[44] Freivald at Abstract (A-811).

[45] *Id.* at col 5, ll. 24-29 (A-824).

[46] *Id.* at col. 7, ll. 3-54 (A-825).

[47] *Ex. 2009* at ¶ 25 (A-1825 – A-1826).

F. Patent Owner's Contingent Motion to Amend.

In connection with its response to the two petitions, Patent Owner filed a

Contingent Motion to Amend.[48] The motion sought to enter proposed claim 47 into

the '799 Patent in the event claim 42 was found invalid.[49] Proposed claim 7 read:

> 47. (Proposed Substitute for Original Claim 42) A computer
> readable storage medium, comprising computer readable program
> code embodied on said computer readable storage medium, said
> computer readable program code for programming a first
> computer to provide updates for transmission to a second
> computer that permits the second computer to obtain most recent
> versions of files, the computer readable program code causing the
> first computer to perform the following steps: (a) determining
> whether the second computer has a latest version of a file, wherein
> said determining is performed by the first computer without
> interaction with the second computer by comparing
> representations of segments of the latest version of the file with
> representations of segments of an earlier version of the file in
> which ends of each of the segments of the earlier version of the file
> are defined by segment delimiters that are statistically determined
> to be optimal division points for the segments; (b) generating an
> update, if the second computer does not have a latest version of

---

[48] A-321 – A-340.

[49] A-325.

the file, wherein said generating is performed by the first

computer without interaction with the second computer; and (c)

transmitting the update from the first computer to the second

computer.[50]

Thus, the proposed substitute claim included all of the limitations of the original

claim and narrowed those features by adding a limitation concerning how the

determining step is performed using file segments having segment delimiters that are

statistically determined. The Motion to Amend included a discussion of how the

amendments were supported in the applications that led to the '799 Patent,[51] why a

person of ordinary skill in the art would have understood the inventor to be in

possession of such an invention,[52] how the proposed claim was to be construed under

the broadest reasonable interpretation,[53] and why the claim should be deemed

patentable over the prior art.[54] Under the regulations then in force, the Motion to

Amend was limited to a total of 15 pages.[55]

---

[50] A-325 – A-326. The underlining in the claim represents the limitations sought to

be added by way of amendment.

[51] A-326 – A-328.

[52] A-328 – A-330.

[53] A-330 – A-336.

[54] A-336 – A-339.

## V.    SUMMARY OF THE ARGUMENT

This Court should reverse, or at least vacate and remand, the Board's determinations concerning the patentability of the challenged claims because the Board failed to apply the proper claim constructions when considering the prior art and, further, because there is no substantial evidence supporting those conclusions.

For example, the Board's conclusions of anticipation in view of Williams rests on an apparent determination of inherency, which is nowhere supported in the reference. When analyzing claims 1, 12, 23, 24, 30, 31, 37, and 42, the Board admits that Williams "*does not* inform us whether the command inserted into the update, or incremental backup file, causes the second computer to duplicate data or information from the old version of the file into the second computer's copy of the current version of the file, as required by the 'writing a command . . . to copy' limitation."[56] Nevertheless, the Board looked to actions performed by the second computer to determine what sort of instruction was inserted into the update file. These actions, however, are indeterminate at best when it comes to understanding those instructions.

---

[55] 37 C.F.R. § 42.24(a)(1)(v) (2012).

[56] Final Written Decision at 24 (A-24) (emphasis added).

According to Williams, the second computer "'processes the incremental backup information, copying subblocks that were transmitted raw and looking up the references either in Y or in the part of X already reconstructed.'"[57] Nothing in this statement suggests, and certainly nothing necessitates, that the Williams' backup file, D, includes instructions that explicitly indicate portions of the old version of the file, Y, to be kept. It is at least equally likely that the backup file, D, includes instructions that explicitly indicate portions of file Y to be removed. Such instructions would be entirely consistent with "looking up the references either in Y or in the part of X already reconstructed." Further, there is no reason why such an instruction would be implied by the encoding of Williams' incremental backup file, D, and any such encoding would be to to *modify* Y so it becomes a replica of X, *not* be to "copy" segments from an old version of Y to a new version of Y.[58] Thus, Williams does not "clearly and unequivocally" disclose the claimed invention.[59]

---

[57] *Id.* citing Williams at col. 20, ll. 2–5 (A-24).

[58] *Ex. 2009* at ¶ 28 (A-1828 – A-1829).

[59] *Cf. Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008) (to anticipate a claim, a reference must "clearly and unequivocally disclose the claimed [invention] or direct those skilled in the art to the [invention] without any need for picking, choosing, and combining various disclosures not directly related to each other

With regard to claims 37 and 42, and their respective dependent claims, the Board's conclusions of obviousness were based on analyses that failed to use the proper constructions of the claims. The Board construed the "determining limitation" of claims 37 and 42 to require determining whether the last version of a subject file sent to the second computer is not the same as the current version of the subject file.[60] However, rather than applying this construction when addressing the question of anticipation, the Board instead remarked that, "the determining limitation does not require absolute certainty that the current version is the latest version."[61] Such a conclusion is inconsistent with the Board's own construction of the claims and led to a faulty analysis of the claims and an improper determination of anticipation.

The same error in construction led to an improper conclusion that claims 5-10 and 16-21 are obvious under 35 U.S.C. § 103 in view of Williams and Miller, and that claims 37 and 42 anticipated are anticipated by Balcha. Further, as explained in detail below, the combination of Williams and Miller does not lead to the subject matter recited in the challenged claims. Nor does Balcha teach writing a command to

---

by the teachings of the cited reference.") quoting *In re Arkley*, 455 F.2d 586, 587 (CCPA 1972).

[60] Final Written Decision at 14 (A-14).

[61] *Id*. at 26 (A-26).

copy in an update file.

With regard to the Board's conclusions of obvious based on combinations of Balcha and Miller, while Miller does describe the use of a copy primitive, the true result of the *Balcha-Miller* teachings is something other than the invention recited in independent claims 1, 12, 23, and 30. Balcha avoids the use of a copy command and, therefore, necessarily reduces the number of bytes needed to convey information in a difference file.[62] Miller advocates the use of as small a difference file as possible. Hence, when considering the teachings of Balcha and Miller as a whole, it would be natural for a person of ordinary skill in the art to adopt the Balcha approach, and eliminate the need for a copy command.[63] Doing so would be in line with the stated goals of both references and would also promote other benefits.[64] Indeed, there is no logical rational for adding the "copy" primitive of Miller to the process of Balcha because its presence would be redundant and would unnecessarily increase the

---

[62] *Ex. 2009* at ¶ 21 (A-1822 – A-1823).

[63] *Id.* at ¶ 24 (A-1824 – A-1825).

[64] *Id.*, *cf.* Miller at col. 1, ll. 65-67 (A-799) (noting that even compression schemes which reduce file sizes of up to 40% may still leave resulting files that represent substantial transmission costs for distributers of those files).

memory and processing costs associated with the storage and processing of the revised file.[65]

Finally, when considering the Patent owner's Motion to Amend, the Board failed to consider Patent Owner's detailed discussion of the state of the art as reflected in the references at issue in the underlying proceeding, which teachings reflected the knowledge of the person of ordinary skill and did not credit Patent owner's unequivocal statement that proposed substitute claim 47, as a whole, was not taught in the prior art. These failings resulted in the Board denying the motion without ever considering the proposed amendments on the merits. Such actions constitute reversible error inasmuch as they do not even comport with the Board's own guidelines for such motions in *inter partes* review proceedings.

For at least these reasons and as discussed in further detail below, the Board's Final Written Decision should be reversed, or at least vacated and the case remanded for further proceedings.

---

[65] *Ex. 2009* at ¶ 24 (A-1824 – A-1825).

## VI.    ARGUMENT

### A. Standard of Review.

In appeals from the Board, this Court reviews conclusions of law *de novo*[66] and findings of fact for substantial evidence.[67] In particular, claim constructions by the Board are reviewed according to the framework announced in *Teva*: underlying factual determinations concerning extrinsic evidence are reviewed for substantial evidence and the ultimate construction of the claim is reviewed *de novo*.[68] In this case, because the intrinsic record fully determines the proper construction of the claim terms at issue, this Court reviews the Board's determinations *de novo*.[69] Anticipation and prior art teachings present questions of fact, reviewed for substantial evidence.[70] Obviousness, however, is a question of

---

[66] *Belkin Int'l, Inc. v. Kappos*, 696 F.3d 1379, 1381 (Fed. Cir. 2012).

[67] See *In re Gartside*, 203 F.3d 1305, 1315-16 (Fed. Cir. 2000).

[68] *Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc.,* 135 S. Ct. 831, 841-842 (2015).

[69] *Id.*

[70] *In re NTP, Inc.*, 654 F.3d 1279, 1297 (Fed. Cir. 2011); *In re Gleave*, 560 F.3d 1331, 1334-35 (Fed. Cir. 2009).

law based on factual findings, including what a reference teaches.[71] The Board's

ultimate determination of obviousness is, therefore, reviewed *de novo*.[72]

### B.    By Conflating Retain-by-Default Synchronization Schemes and Discard-by-Default Schemes, the Board Read Out the Requirements of Claims 1, 12, 23, 24, 30, and 31 in Order to Find Anticipation by Williams.

In its Final Written Decision, the Board determined that, "generating update

files using *either* a retain-by-default scheme *or* a discard-by-default scheme may meet

the recited "writing a command . . . to copy" because *either* a *copy command* or a *delete*

*command* may cause the second computer to duplicate information or data from an

earlier version of a file into a current version of a file."[73] This determination ultimately

resulted in the Board finding claims 1, 12, 23, 24, 30, 31, 37, and 42 anticipated by

Williams because the Board believed that all that was required to determine whether

Williams teaches the "writing a command . . . to copy" limitation of the claims was to

"look to the relevant portions of Williams cited by both parties to understand *what*

---

[71] *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012); *In re Mettke*, 570 F.3d 1356, 1358 (Fed. Cir. 2009).

[72] *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000).

[73] Final Written Decision at 21 (A-21) (emphasis added).

*Williams's second computer does with the incremental backup file*."[74] In the Board's view then, examining the result of an operation performed by the second computer is sufficient to determine whether a limitation directed to an action by the first computer (writing a command to copy in an update file) is met. This is not so. Instead of focusing on the limitations recited in the challenged claims, the Board's analysis focuses on the results of (unclaimed) operations at a receiving computer. Such an analysis is not a correct focus of an anticipation inquiry and, hence, the Board's conclusions of anticipation should be reversed, or, at a minimum, vacated and remanded for further consideration.

In finding claims 1, 12, 23, 24, 30, 31, 37, and 42 anticipated by Williams, the Board concluded that "Identifying blocks that are to be kept (as opposed to identifying blocks to be discarded) is a characteristic of a discard-by-default scheme, nullifying Patent Owner's argument that Williams just as likely could be using a retain-by-default scheme."[75] This is simply not true and no substantial evidence supports such a conclusion. The Board's opinion recognizes that "retain-by-default indicates that, when generating a new version of the file, each portion of the old version of the file is kept unless the update explicitly indicates removing that portion.

---

[74] *Id.* at 24 (A-24) (emphasis added).

[75] *Id.* at 23-24 (A-23 – A-24).

Conversely, discard-by-default indicates that, when generating a new version of a file, each portion of the old version of the file is discarded unless the update explicitly indicates keeping that portion."[76] The Board further admits, with respect to Williams, "the scheme used ***does not*** inform us whether the command inserted into the update, or incremental backup file, causes the second computer to duplicate data or information from the old version of the file into the second computer's copy of the current version of the file, as required by the 'writing a command . . . to copy' limitation."[77] Consequently, the Board looked to the second computer described by Williams to determine what activities take place.

According to Williams, the second computer "'processes the incremental backup information, copying subblocks that were transmitted raw and looking up the references either in Y or in the part of X already reconstructed.'"[78] Nothing in this statement suggests, and certainly nothing necessitates, that the Williams' backup file, D, includes instructions that explicitly indicate portions of the old version of the file, Y, to be kept (as in a discard-by-default scheme). It is at least equally likely that the backup file, D, includes instructions that explicitly indicate portions of file Y to be

---

[76] *Id.* at 19-20 (A-19 – A-20).

[77] *Id.* at 24 (A-24) (emphasis added).

[78] *Id.* at 24 citing Williams at col. 20, ll. 2–5 (A-24).

removed. Such would be entirely consistent with "looking up the references either in Y or in the part of X already reconstructed."

The Board apparently concluded that the "references" in Williams' D file may be interpreted as "commands to copy" but this conclusion is not explicit in the teachings of Williams, nor is it inherent in those teachings. Patent Owner's declarant testified that not only does Williams not teach such commands, there is no reason why such an instruction would be implied by the encoding of Williams' incremental backup file, D, either.[79] Because Williams is concerned with an incremental backup system in which Y is updated to become a copy of X,[80] any encoding in the D file would **not** be to "copy" segments from an old version of Y to a new version of Y, but rather to **modify** the old version of Y so it becomes a replica of X.[81] This would be consistent with the stated goal of *Williams* and would **not** entail copying of segments of Y as envisioned in the '799 Patent.[82] As no copying is needed, there is no need for an instruction to effect same to be written in the D file.[83]

---

[79] *Ex. 2009* at ¶ 28 (A-1828 – A-1829).

[80] Williams at col. 19, ll. 31-33 (A-869).

[81] *Ex. 2009* at ¶ 28 (A-1828 – A-1829).

[82] Williams makes reference to "copying" in the context of reproducing raw subblocks that are transmitted along with the update, and not copying of subblocks already

Anticipation requires that a cited reference describe *each and every limitation* of a claim either explicitly or inherently. It is undisputed that there is no explicit description of a command to copy in Williams.[84] Nor are any such teaching inherent

included in the second computer's version of file Y. Williams at col. 20, ll. 2-5 (A-869) ("[E2] then processes the incremental backup information, copying subblocks that were transmitted raw and looking up the references either in Y or in the part of X already reconstructed."). Claims 1, 12, 23, 24, 30, and 31 require, however, that the "command to copy" be an instruction written in the update file and that the command instruct the second computer to copy "an old segment of the second computer's copy of the earlier version of the file," *not* copy any raw data provided in an update into a file. *See, e.g.*, *'799 Patent* at Claim 1, col. 14, ll. 53-57 (A-67).

[83] *Ex. 2009* at ¶ 28 (A-1828 – A-1829). Indeed, it is equally plausible that mere pointers, such as those taught by Balcha, could be used to identify existing subblocks in the Y file. Doing so would avoid the need for copy commands entirely and be entirely consistent with the goal of others of the cited references: to reduce the size of a difference file that needs to be communicated between computers.

[84] Final Written Decision at 24 (A-24) ("the scheme used does not inform us whether the command inserted into the update, or incremental backup file, causes the second computer to duplicate data or information from the old version of the file into the

in Williams. To establish inherency, the extrinsic evidence "must make clear that the missing descriptive matter is *necessarily present* in the thing described in the reference, and that it would be so recognized by persons of ordinary skill. Inherency, however, *may not be established by probabilities or possibilities.* The mere fact that a certain thing may result from a given set of circumstances is not sufficient."[85]

Here, neither the Board's analysis nor the testimony of Petitioner's declarant demonstrated any basis in fact and/or technical reasoning to support a determination that the allegedly inherent characteristic *necessarily flows* from the teachings of Williams. Further, Patent Owner's declarant explained that there would be no need for a "command to copy" or any other instruction to that effect to be written in the Williams' D file.[86] Examining the results of the update operations at the second computer, as the Board did, is not determinative of which scheme, retain-by-default or discard-by default, was used, because although the two schemes produce similar

---

second computer's copy of the current version of the file, as required by the 'writing a command . . . to copy' limitation.").

[85] *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (emphasis added).

[86] *Ex. 2009* at ¶ 28 (A-1828 – A-1829).

results, they do so using entirely different approaches necessitating different commands in a difference file.[87]

Thus, Williams cannot be relied upon for teaching writing a command to copy in an update file, and cannot be said to "clearly and unequivocally" disclose the claimed invention.[88] For at least these reasons, the Board's conclusions of anticipation as to claims 1, 12, 23, 24, 30, and 31 of the '799 Patent in view of Williams should be reversed.

### C.    The Board's Faulty Analysis of Claims 37 and 42 Led to an Erroneous Conclusion of Anticipation by Williams.

Claims 37 and 42 each recite "determining whether the second computer has a latest version of a file . . . [and] generating an update[] if the second computer does

---

[87] *Ex. 1007* at ¶¶ 22-26 (A-888 – A-891).

[88] *Cf. Net MoneyIN, Inc.*, 545 F.3d at 1371 (to anticipate a claim, a reference must "clearly and unequivocally disclose the claimed [invention] or direct those skilled in the art to the [invention] without any need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference.") quoting *In re Arkley*, 455 F.2d 586, 587 (CCPA 1972).

not have a latest version of the file."[89] The Board concluded that because "the determining limitation does not require absolute certainty that the current version is the latest version," Williams anticipates claims 37 and 42.[90] Because the Board's analysis in this regard is wrong, this holding should be reversed.

As part of its review, the Board consulted the '799 Patent and concluded "the 'determining limitation' to be determining, by the first computer using known techniques based on information it has access to and without interaction with the second computer, whether the last version of the subject file sent to the second computer is not the same as the current version of the subject file."[91] However, the Board failed to apply this construction when addressing the question of anticipation by Williams. By its terms, the Board's construction requires that the first computer determine *whether the last version of the subject file sent to the second computer* is not the same as the current version of the subject file. Notably, it is *not* the the last version of the subject file sent to the second computer *by the first computer* that is of import in this construction, but rather *the last version of the subject file.*

---

[89] *'799 Patent* at col. 18, ll. 32-37 (A-69).

[90] Final Written Decision at 26 (A-26).

[91] *Id.* at 14 (A-14).

Yet when the Board considered the question of anticipation by Williams, the meaning of the determination step changed such that "the determining limitation does not require absolute certainty that the current version is the latest version."[92] The *last version of the subject file*—the version demanded by the Board's construction—*is* the *latest version* of that file. The Board's construction does not admit of other versions. Hence, the Board should have determined whether Williams teaches a determining step in which the the first computer, using known techniques based on information it has access to and without interaction with the second computer, determines whether *the last version of the subject file sent to the second computer* is not the same as the current version of the subject file.[93]

Williams describes an incremental backup procedure in which a computer E1 backs up a file to computer E2 so that the version of a file Y stored on E2 is changed to match the version of file X stored on E1.[94] As explained by Patent Owner's declarant, prior to initiating a backup procedure, computer E1 cannot be certain whether or not computer E2 stores a latest version of the subject file.[95] Nor does

---

[92] *Id.* at 26 (A-26).

[93] *Id.* at 14 (A-14).

[94] Williams at col. 19, ll. 29-33 (A-869).

[95] *Ex. 2009* at ¶ 29 (A-1829).

Williams mandate such a situation. Indeed, as part of the backup file itself, computer E1 includes an MD5 digest of the old and new versions of the file.[96] This is to ensure, in part, that the backup is applied to the same version of the file for which the comparisons of hashes was made.[97] Thus, Williams is both recognizing and accommodating situations in which computer E2 may store a different, but not necessarily a latest, version of a file than computer E1.[98]

"A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference."[99] In the present case, Williams does not teach determining whether the second computer has a latest version of a file and generating an update if the second computer does not have a latest version of the file. Instead, Williams generates the update when the backup system determines that a backup should be made. Such actions can be accommodated because Williams' D file includes information sufficient for computer E2 to ensure the differences are applied to the correct prior version of the file. Accordingly, Williams does not anticipate claims 37 and 42.

---

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987).

For at least the foregoing reasons, the Board's conclusions of anticipation as to claims 37 and 42 of the '799 Patent in view of Williams should be reversed, or at least remanded for further consideration.

### D.     The Board's Flawed Decisions Regarding Williams Led to the Erroneous Conclusion that Claims 5-10 and 16-21 are Obvious in View of Williams When Considered in Combination with Miller.

The Board based its conclusion that claims 5-10 and 16-21 are obvious under 35 U.S.C. § 103 in view of Williams and Miller on its flawed analysis of Williams.[100] However, as discussed above, *Williams* fails to teach a "command to copy" as recited in claims 1 and 12, from which claims 5-10 and 16-21 depend, respectively. This alone would be sufficient reason to reverse the Board's conclusions with respect to claims 5-10 and 16-21, or at least vacate same and return the case for further consideration.

Further, although the Board acknowledged Petitioner's argument that the combination of Williams and Miller is one that would be made by a person of ordinary skill in the art,[101] the Board did not explain why that argument should prevail. Indeed, the Board provided no insight into why it concluded that Petitioner's

---

[100] Final Written Decision at 27 (A-27).

[101] *Id.* at 27-28 (A-27 – A-28).

argument should prevail.[102] Nor does the Board acknowledge the countervailing

evidence introduced by Patent Owner that the true result of the proposed

combination of Williams and Miller, does not lead to the subject matter recited in the

claims of the '799 Patent.[103]

Obviousness is, ultimately, a legal conclusion that this Court reviews de novo.

[104] While Miller does describe a procedure for revising large computer files using

DIFF files that include primitives for "copy," "insert" and "insert/copy" operations,

which impart directives for handling stings that appear in new and old copies of the

subject file,[105] Miller nevertheless seeks to create a DIFF file that will indicate changes

between an old file and a new file in a minimum number bytes so that the DIFF file is

the smallest such file possible.[106] When seeking to combine the teachings of references

under Section 103, it is the entirety of the teachings that must be considered.[107]

---

[102] *Id.*

[103] See Patent Owner's Response at 34-37 (A-314 – A-317).

[104] *See, e.g.*, *Belkin Int'l, Inc.*, 696 F.3d at 1381.

[105] *See, e.g.*, Miller at Fig. 5A (A-791).

[106] *Id.* at col. 2, ll. 21-24, 31-33 (A-799).

[107] *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540 (Fed. Cir. 1983), *cert. denied*, 469 U.S. 851 (1984).

Hence, neither Petitioners nor the Board can simply ignore or overlook the fact that Miller's goal is to produce a smallest possible DIFF file.

A person of ordinary skill in the art would recognize that Williams difference file, D, which uses only references to prior subblocks and not primitives is in line with the goal of producing the smallest possible DIFF file. By avoiding the use of a copy command, Williams necessarily reduces the number of bytes needed to convey information in the difference file. Hence, when combining the teachings of Williams and Miller it would be natural for a person of ordinary skill in the art to adopt the Williams approach and eliminate copy commands. Doing so would reduce the number of bytes required in the difference file and save on transmission costs.[108]

If anything then, a Williams and Miller combination would still fail to provide a difference file having a "command to copy," as required by claim 1, and, hence, claim 1 would remain patentable over these references. Claims 5-10 depend from claim 1 and are patentable over the combination of Williams and Miller for at least

---

[108] *Ex. 2009* at ¶ 30 (A-1830), and *cf.* Miller at col. 1, ll. 65-67 (A-799) (noting that even compression schemes which reduce file sizes of up to 40% may still leave resulting files that represent substantial transmission costs for distributers of those files).

the same reasons as claim 1.[109] The same would be true for claim 12, and its dependent claims 16-21.

For at least the foregoing reasons, the Board's conclusions of obviousness should be revered or at least remanded for further consideration.

### E.    The Board's Error When Construing "Determining" Led to Claims 37 and 42 Being Found Anticipated by Balcha.

Claims 37 and 42 recite "determining whether the second computer has a latest version of a file . . . [and] generating an update[] if the second computer does not have a latest version of the file."[110] The Board determined that these claims were anticipated by Balcha, "[b]ased on [its] construction of the determining limitation, particularly in light of the fact that the determining limitation recites that the determination is made by the first computer without interaction with the second computer."[111] However, the Board does not explain how it reached this conclusion.

As explained above, the Board construed "the 'determining limitation' to be determining, by the first computer using known techniques based on information it

---

[109] *In re Fine*, 837 F.2d 1071 (Fed. Cir. 1988) (If an independent claim is nonobvious under 35 U.S.C. § 103, then any claim depending therefrom is nonobvious.).

[110] *'799 Patent* at col. 18, ll. 32-37 and col. 18, l. 56 - col. 19, l. 7 (A-69 – A-70).

[111] Final Written Decision at 29 (A-29).

has access to and without interaction with the second computer, whether the last version of the subject file sent to the second computer is not the same as the current version of the subject file."[112] Balcha fails to meet this requirement, and the Board has not explained why or how it concluded otherwise. As discussed above, Balcha discloses sharing changes between two base files.[113] However, Balcha only discloses detecting a modification to the file by one computer, without regard to whether the modified file is the latest version of the file.[114] That is, Balcha does not determine "whether the last version of the subject file sent to the second computer is not the same as the current version of the subject file," as required by the Board's construction.

According to Balcha, when a modification of base file 21 is detected by server 22, server 22 generates a new delta file and communicates that delta file to server 24, which then proceeds to modify base file 27 using the delta file.[115] However, the detection of the modification of base file 21 is in no way related to, or dependent upon, a determination that base file 21 is the latest version of the base file.[116] Instead,

---

[112] *Id.* at 14 (A-14).

[113] Balcha at col. 4, ll. 52-67 (A-777).

[114] *Ex. 2009* at ¶ 16 (A-1818).

[115] *Id.*

[116] *Id.*

*Balcha* only discloses detecting whether a base file has been modified, regardless of when that modification may have occurred relative to other copies of the same base file.[117]

To anticipate a claim, "The identical invention must be shown in as complete detail as is contained in the … claim."[118]  Balcha fails to meet this requirement and fails to disclose "within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, [hence] it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102."[119] Hence, for at least these reasons, the Board's conclusions that Balcha anticipates claims 37 and 42 should be reversed.

---

[117] *Id.*

[118] *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989).

[119] *Net MoneyIN, Inc.*, 545 F.3d at 1371.

### F.    The Same Error Affects the Board's Conclusions of Obviousness Over Balcha and Freivald.

The Board determined that claims 37 and 42 were obvious over Balcha when considered in combination with Freivald,[120] this time citing Freivald as teaching the determining step.[121] This conclusion was flawed because Freivald simply fails to mention such features and, furthermore, is unconcerned with whether the client computer has any copy of a file.[122] Accordingly, this determination of obviousness should be reversed.

In the Freivald system, registered Web pages (or portions thereof) are checked periodically to see if they have changed since a last check. When changes are noted, a minder server so notifies the user by way of email.[123] Thus, Freivald is unconcerned with whether or not a subscribed client has a latest version of a Web page (or any version at all for that matter), and sends notifications whenever qualifying changes in a

---

[120] Final Written Decision at 30 (A-30).

[121] *Id.*

[122] *Ex. 2009* at ¶ 25 (A-1825 – A-1826).

[123] *Freivald* at col 5, ll. 24-29; col. 7, ll. 3-54 (A-825, A-825).

Web page have been detected, regardless of whether the modifications reflect the latest version of the file or not.[124]

Considering the combination of Balcha and Freivald then, one readily recognizes that these references do not, even when considered in view of one another, teach or suggest the subject matter recited in claims 37 and 42.  "[T]he 'determining limitation' [requires] determining, by the first computer . . ., whether the last version of the subject file sent to the second computer is not the same as the current version of the subject file."[125] Balcha fails to meet this requirement, and instead only discloses detecting a modification to the file by one computer, without regard to whether the modified file is the latest version of the file.[126] Freivald is unconcerned with whether or not a subscribed client has a latest version of a Web page (or any version at all for that matter), and sends notifications whenever qualifying changes in a Web page have been detected, regardless of whether the modifications reflect the latest version of the file or not.[127] Hence, the combination of Balcha and Freivald fails to teach or suggest

---

[124] *Ex. 2009* at ¶ 25 (A-1825 – A-1826).

[125] Final Written Decision at 14 (A-14).

[126] *Ex. 2009* at ¶ 16 (A-1818).

[127] *Id.* at ¶ 25 (A-1825 – A-1826).

the required "determining" step, and so the Boards conclusions of obviousness should be reversed.[128]

### G.    The Board Erred in Concluding that Claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31 Are Obvious Over Balcha When Considered in Combination with Miller.

The Board considered claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31 in view of the combined teachings of Balcha and Miller and, "In light of [its] construction of 'writing a command . . . to copy,' at least Miller teaches 'writing a command . . . to copy.' Specifically, regardless of the name of the command ('copy' versus 'delete') used Miller discusses creating a new file and, using the diff file and the old file, '[s]trings will be copied or inserted into the new file.'"[129] Therefore, and because "there are only limited options, and electing to generate a new file (thus retaining prior versions) would have been obvious for a skilled artisan to try," the claims were found to be obvious.[130] This holding should be reversed because even if a

---

[128] *CFMT, Inc. v. Yieldup Intern. Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) ("obviousness requires a suggestion of all limitations in a claim") *citing In re Royka*, 490 F.2d 981, 985 (CCPA 1974).

[129] Final Written Decision at 32-33 (A-32 – A-33).

[130] *Id.* at 33 (A-33).

person of ordinary skill in the art were to combine the teachings of Balcha and Miller, the resulting combination would not yield the invention recited in any of independent claims 1, 12, 23 or 30.

The key to supporting any rejection under Section 103 is the clear articulation of the reasons why the claimed invention would have been obvious.[131] As discussed above, claims 1, 12, 23, and 30 each specify:

> writing a command in the update for the second computer to copy an old segment of the second computer's copy of the earlier version of the file into the second computer's copy of the current version of the file.

a plain reading of this requirement demands that a *command to copy* be written in the update that is used by the second computer to generate a copy of the current version of the file.[132] The Balcha-Miller combination fails to teach or suggest same.

As described above, in Balcha, it is "insert," "modify," and "delete" primitives that are used in connation with difference or update files.[133] Data within the old version of the file that is not modified or deleted remains in the new version of the file with no need to copy that information from the old version of the file to the new

---

[131] *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007).

[132] *Ex. 2009* at ¶ 19 (A-1820).

[133] Balcha at col. 3, ll. 55-56 (A-777).

version of the file.[134] Consequently, Balcha has no need for and does not write a copy "primitive" (or any other instruction) into the delta file to effect the copying of data from the old version of the file into the new version of the file.[135]

Miller's DIFF file does include a primitive for "copy," which imparts directives for handling stings that appear in new and old copies of the subject file.[136] However, Miller also specifies that the DIFF file must indicate changes between the old file and the new file in a minimum number of bytes so that the DIFF file is the smallest such file possible.[137] Doing otherwise would defeat Miller's very objective.[138]

Based on the above, it is apparent that the true result of the combination of the Balcha-Miller teachings is something other than the invention recited in independent claims 1, 12, 23, and 30 of the '799 Patent. By avoiding the use of a copy command, Balcha necessarily reduces the number of bytes needed to convey information in the difference file.[139] Hence, when considering the teachings of Balcha and Miller as a

---

[134] *Ex. 2009* at ¶ 21 (A-1822 – 1823).

[135] *Id.*

[136] *See, e.g.*, Miller at Fig. 5A (A-791).

[137] *Id.* at col. 2, ll. 21-24, 31-33 (A-799).

[138] *Ex. 2009* at ¶ 24 (A-1824 – A-1825).

[139] *Ex. 2009* at ¶ 21 (A-1822 – 1823).

whole,[140] it would be natural for a person of ordinary skill in the art to adopt the

Balcha approach, and eliminate the need for a copy command.[141] Doing so would be

in line with the stated goals of both cited references and indeed one would imagine

the goal of the hypothetical person of ordinary skill inasmuch as reducing the number

of bytes required in the difference file would save on transmission costs.[142]

Additionally, there is no logical rational for a skilled artisan to add the "copy"

primitive of Miller to the process of Balcha because execution of the "copy" primitive

within the process of Balcha would require the coping of data into the updated file

that was already included within the file, thereby causing redundant data to be

unnecessarily and illogically added to the updated version of the file.[143] Such

redundancy would necessarily increase the memory and processing costs associated

---

[140] *W.L. Gore & Associates*, 721 F.2d 1540.

[141] *Ex. 2009* at ¶ 24 (A-1824 – A-1825).

[142] *Id., cf.* Miller at col. 1, ll. 65-67 (A-799) (noting that even compression schemes

which reduce file sizes of up to 40% may still leave resulting files that represent

substantial transmission costs for distributers of those files).

[143] *Ex. 2009* at ¶ 24 (A-1824 – A-1825).

with the storage and processing of the revised file, a concept inapposite to <u>both</u> Balcha and Miller.[144]

Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination.[145] Indeed, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention.[146] Here, however, the true result of the combination of the Balcha-Miller teachings is something other than the invention recited in independent claims 1, 12, 23, and 30 of the '799 Patent. Thus, for at least the foregoing reasons, the Board's conclusions regarding the obviousness of claims 1, 12, 23, and 30, and their respective dependent claims over the combination of Balcha and Miller should be reversed.

---

[144] *Id.*

[145] *KSR*, 550 U.S. at 418.

[146] *Id.* at 421; see also *Bayer Schering Pharm. AG v. Barr Labs., Inc.*, 575 F.3d 1341, 1350 (Fed. Cir. 2009) (Newman, J., dissenting) ("The statutory criterion is whether the invention would have been obvious to persons of ordinary skill at the time of the invention, not whether it is sufficiently simple to appear obvious to judges after the discovery is finally made . . . .").

### H.    Claims 6-8 and 17-19 Remain Patentable Over Balcha Even When Considered in Combination with Miller and Freivald.

The Board's conclusions of obviousness regarding claims 6 – 8 and 17-19 are in view of the combined teachings of Balcha, Miller, and Freivald are based on the same considerations as Balcha and Miller described above.[147] Freivald is cited for the proposition that it was known in the art to periodically check to see if a monitored Web page has been updated (*e.g.*, as determined by time stamp references) and, if so, to notify a client computer of same by emailing a copy of the updated web page to the client.[148] Whether this is true or not, considering such teachings in combination with those of Balcha and Miller would not alter the conclusion that claims 1 and 12 (and, hence, dependent claims 6 – 8 and 17-19) remain patentable Balcha and Miller for at least the reasons discussed above.

Even if the combination of Balcha and Miller were adopted, it would lead one of ordinary skill in the art to use updates that were as small as possible.[149] As demonstrated above, such updates would not include "commands to copy" written in the update. Nor would the updates include entire copies of new web pages as

---

[147] Final Written Decision at 34 (A-34).

[148] *Id.*

[149] *Ex. 2009* at ¶ 24 (A-1824 – A-1825).

advocated by Freivald[150] for it is hard to imagine a larger difference file than one that included an entire copy of the subject Web page for which the update was being sent. If anything, one of ordinary skill in the art may be more tempted to avoid using any of the Freivald teachings whatsoever as it appears they advocate a scheme in which little or no consideration is given to the goals of minimizing the size of the updates. Accordingly, the resulting combination of Balcha, Miller and Freivald would still be deficient for at least the reasons discussed above with respect to claim 1, and the Board's conclusions of obviousness should be reversed.

---

[150] Freivald describes a subscription service in which users that wish to be notified of changes to Web pages or portions thereof (e.g., when information thereon is updated), "register" those pages and an associated subscription server (or "minder") periodically checks to see if the registered Web pages have changed. Upon detecting changes, the server so notifies the user by way of email. Freivald at FIGs. 2-4; col. 5, ll. 24-29; col. 7, ll. 3-54 (A-813 – A-815, A-824, A-825). The email notification optionally includes a copy of the new Web page itself, *id.* at col. 2, ll. 45-48; col. 6, ll. 27-31 (A-822, A-824), and never is the client computer provided with anything that would allow it to build a current version of the Web page from an older, local copy of that web page.

I.    The Board Failed to Credit Patent Owner's Discussion of the Prior Art as Indicative of the Level of Ordinary Skill in the Art.

The Board criticized Patent Owner's Motion to Amend as failing to address the level of ordinary skill in the art.[151] In doing so, however, the Board ignored Patent Owner's detailed discussion of the state of the art as reflected in the references at issue in the underlying proceeding, which teachings reflected the knowledge of the person of ordinary skill.[152] In particular, Patent Owner's Motion to Amend noted that,

> Transmitting files between computers as a number of different segments (rather than as an entire file) has been a technique used for many decades. Often it was used as a way to cope with low bandwidth transmission links that interconnected the computers. Accordingly, many different methods have been employed as means of segmenting files. Those methods can be broadly categorized as ones for creating fixed length segments (in which all segments are of the same size) and ones for creating variable length segments (in which segments need not all be the same size). In each instance, different segments of a file are identified by the presence of delimiters—characters or symbols that separate the elements of a file so that one part of the file can be distinguished

---

[151] Final Written Decision at 38 (A-38).

[152] See, e.g., *Chore-Time Equipment, Inc. v. Cumberland Corp.,* 713 F.2d 774 (Fed. Cir. 1983); *Okajima v. Bourdeau,* 261 F.3d 1350, 1355 (Fed. Cir. 2001).

from another. *Ex 2009* at ¶ 38; *Ex. 1016* at p.61.

At the time of the invention of the '799 patent, segmenting a file into fixed length segments generally involved dividing the file at predetermined points, irrespective of the file contents. *See, e.g.*, *Ex. 1003* at col. 6, ll. 31-44. This means that position within a file, rather than other considerations, was the basis for segmenting the file. Variable length file segmentation, on the other hand, involved determining segment boundaries based on file contents, rather than positions. Ex. 2009 at ¶ 39. At the time of the invention of the '799 Patent, variable length file segments were employed in connection with schemes for file synchronization. For example, *Williams* taught a method of file synchronization in which variable length segments were used. *Id.*, *Ex. 1006* at col. 14, ll. 3 et seq.

Determining the actual file segment boundaries, the delimiters, for variable length file segments can be done in a variety of ways. For example, at the time of the invention of the '799 Patent it was common to use a content-based approach in which the presence of a particular character (or characters) was used to denote a segment boundary. *Ex. 2009* at ¶ 40. As *Williams* notes, however, this leads to problems when the character is too common within the file. *Id.* citing *Ex. 1006* at col. 14, ll. 54-63. *Williams* also recognized that it may be desirable to employ different file segmenting strategies in a single application. *Id.*

citing *Ex. 1006* at col. 14, ll. 23-62.[153]

This explanation of the knowledge in the art, supported by the cited testimony of

Patent Owner's declarant, provided a coherent and comprehensive understanding of

the level of skill in the art at the time of the invention of the '799 Patent and the

Board should have credited and considered same in its Decision.

### J.     The Board's Failed to Acknowledge Patent Owner's Assertions of Patentability Over the Prior Art Generally, and Instead Addressed only the Assertions Over the Prior Art Cited by Petitioner.

A Motion to Amend in an *inter partes* review is expected to explain the why the

proposed substitute claim is patentable over the prior art.[154] In the present case, the

---

[153] A-336 – A-338.

[154] *Idle Free Systems, Inc. v. Bergstrom, Inc.*, Case IPR2012-00027, Paper 26 at 7

(P.T.A.B. June 11, 2013) ("A patent owner should identify specifically the feature or

features added to each substitute claim, as compared to the challenged claim it

replaces, and come forward with technical facts and reasoning about those feature(s),

including construction of new claim terms, sufficient to persuade the Board that the

proposed substitute claim is patentable over the prior art of record, and over prior art

not of record but known to the patent owner. The burden is not on the petitioner to

Board criticized the Patent Owner's Motion to Amend as addressing only prior art

references cited by the Petitioner and not the prior art generally. According to the

Board, "Although Patent Owner is not expected to know of all pre-existing prior art,

it is expected to indicate what it does know, particularly with respect to the feature it

has proposed to add to the original patent claims, i.e., defining segments 'by segment

delimiters that are statistically determined to be optimal division points.'"[155] Because,

in the Board's view, the Motion to Amend did not meet this minimum requirement,

the motion was denied.[156]

The Board's conclusions regarding the scope and content of the Patent Owner's

Motion to Amend were wrong. As specifically stated in the motion,

> What was not done, prior to the invention of the '799 Patent,
>
> however, was to employ, in a method for providing updates as

---

show unpatentability, but on the patent owner to show patentable distinction over the

prior art of record and also prior art known to the patent owner. Some representation

should be made about the specific technical disclosure of the closest prior art known

to the patent owner, and not just a conclusory remark that no prior art known to the

patent owner renders obvious the proposed substitute claims.").

[155] Final Written Decision at 39 (A-39).

[156] *Id.* at 39-40 (A-39 – A-40).

part of a file backup, a file segmenting method in which segments
of a file are defined by segment delimiters that are statistically
determined to be optimal division points for the segments. *Id.* at ¶
41. Instead, optimum segment sizes were usually determined on
the basis of available bandwidth on a network link, or enabling
rapid comparisons of segments. *Id.* citing *Ex. 1006* at col. 14, ll.
23-62. The '799 Patent thus advanced the state of the art by
introducing a new methodology for determining file segment
delimiters when providing updates as part of a file backup. *Id.*[157]

Contrary to the Board's characterization, this was an unequivocal statement by the

Patent Owner that claim 47, as a whole, was not taught in the prior art. The assertion

was not qualified by any reliance on "only prior art references cited by the Petitioner,"

and instead indicated that the subject matter of the claim "was not done[]prior to the

invention of '799 Patent."[158]

The Board does not require a patent owner to "know of all pre-existing prior

art," but does demand that a patent owner "indicate what it does know, particularly

with respect to the feature it has proposed to add to the original patent claims."[159]

This is exactly what the Patent Owner did in its motion when Patent Owner asserted

---

[157] A-338.

[158] *Id.*

[159] Final Written Decision at 39 (A-39).

that prior to the invention, the claimed subject matter was not known in the art. To the extent that the Board required Patent Owner to address separately any known instance of the use of segment delimiters that are statistically determined to be optimal division points, the inquiry is both irrelevant and in conflict with the Board's stated requirements for motions to amend.

First, claims are not evaluated limitation-by-limitation when assessing their patentability.[160] Second, in *Idle Free* the Board explained that a patent owner is expected to show patentability of the claim, not an element of the claim.[161] Patent Owner's motion met these requirements by explaining that the proposed claim was

---

[160] See, e.g., *Net MoneyIN, Inc.*, 545 F.3d at 1369 ("Because the hallmark of anticipation is prior invention, the prior art reference—in order to anticipate under 35 U.S.C. § 102—must not only disclose all elements of the claim within the four corners of the document, but must also disclose those elements 'arranged as in the claim.'") quoting *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed.Cir.1983); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530 (Fed. Cir. 1983) (In determining the differences between the prior art and the claims, the question is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious.).

[161] *Idle Free Systems, Inc.*, IPR2012-00027, Paper 26 at 7.

not known in the art, and then identifying specifically how the art being cited in the proceeding did not meet the limitations. It is axiomatic that a Patent Owner cannot address art of which it is unaware, therefore, the statements concerning the patentability of the claim as a whole met the requirements for a motion to amend in an *inter partes* review.

In denying the Patent Owner's Motion to Amend, the Board held Patent owner to a standard even the Board's own cases do not require. Further, the Board failed to credit the Patent Owner's statements concerning the patentability of the proposed claim over the art generally, and focused solely on comments directed to the particular references at issue in the proceeding. This was error and denied Patent Owner the opportunity to have the motion granted and the proposed claim considered on the merits. Accordingly, this Court should vacate the Board's decision in this regard and remand the case for further proceedings consistent with entry of the Patent Owner's Motion to Amend.

## VII.  CONCLUSION

For at least the forgoing reasons, the Board's patentability determinations concerning claims 1, 5-10, 12, 16-21, 23, 24, 30, 37, and 42, and the Board's denial

of Patent Owner's Motion to Amend should be reversed, or at least vacated and the case remanded for further determinations consistent with the correct construction of the claims.

Date: September 4, 2015

Respectfully submitted,

*/s/ Tarek N. Fahmi*
Tarek N. Fahmi
Attorney for Appellant

Ascenda Law Group, PC
333 W. San Carlos Street, Suite 200
San Jose, CA 95110
Tel: 866-877-4883
Email: tarek.fahmi@ascendalaw.com

## VIII.   ADDENDUM

Trials@uspto.gov                                              Paper 37
571-272-7822                                          Date:  March 19, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

UNIFIED PATENTS, INC.,
SAP AMERICA INC.,
Petitioners,

v.

CLOUDING IP, LLC,
Patent Owner.

_____

Case IPR2013-00586
Case IPR2014-00306
Patent 6,738,799 B2

_____

Before JAMESON LEE, JUSTIN BUSCH, and RAMA G. ELLURU,
*Administrative Patent Judges.*

BUSCH, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

I. BACKGROUND

Unified Patents, Inc. ("Unified") filed a Petition (Paper 1, "Pet.")

requesting *inter partes* review of claims 1, 5–10, 12, 16–21, 23, 24, 30, 31,

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

37, and 42 (the "challenged claims") of U.S. Patent No. 6,738,799 B2 ("the '799 Patent") under 35 U.S.C. §§ 311–319.  On March 21, 2014, the Board instituted an *inter partes* review of the challenged claims on six asserted grounds of unpatentability ("Dec. on Inst.").  Paper 9.  On December 27, 2013, SAP America, Inc. ("SAP") filed a petition (the "SAP Petition"), asserting the same grounds (against the same claims) as asserted by Unified in the Petition.  On May 20, 2014, the Board instituted an *inter partes* review of the challenged claims and joined the review based on the SAP Petition with this *inter partes* review.  Paper 17.  Subsequent to institution and joinder of the two reviews, Clouding IP, LLC ("Patent Owner") filed a Patent Owner Response ("PO Resp.") responding to the petitions filed by Unified and SAP (collectively, "Petitioners").  Paper 18.  Patent Owner also filed a Contingent Motion to Amend ("MTA" or "Mot. to Amend").  Paper 19.  Petitioners filed a Reply (Paper 22, "Pet. Reply") to the Patent Owner Response and an Opposition (Paper 23, "Opp. MTA") to the Contingent Motion to Amend.  Patent Owner filed a Reply to Petitioners' Opposition to the MTA ("PO Reply").  Paper 25.  Oral hearing was held on October 16, 2014.[1]

The Board has jurisdiction under 35 U.S.C. § 6(c).  This final written decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons that follow, we determine that Petitioners have shown by a preponderance of the evidence that the challenged claims are unpatentable.  Patent Owner's Contingent Motion to Amend is denied.

---

[1] The record includes a transcript of the oral hearing ("Hr'g Tr.").  Paper 35.

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

*A. The '799 Patent (Ex. 1001)*

The '799 Patent is related to a method for file synchronization using a signature list. Ex. 1001, Title. In particular, the '799 Patent discloses a method for synchronizing the local copies of files on client computers to the current versions of the files on a network drive. Ex. 1001, 1:24–27. According to the '799 Patent, an object of the method is to provide a mechanism by which a user can be provided automatically with a current version of a subscription file in an efficient manner. Ex. 1001, 3:36–41. This is accomplished by having a server computer monitor network files for changes, and then send users email notifications and updates when there is a change to the files. Ex. 1001, 3:41–44.

*B. Illustrative Claim*

Of the challenged claims, claims 1, 12, 23, 30, 37, and 42 are independent claims. Claim 1 is similar to claim 23, with the exception that claim 1 includes an additional limitation ("wherein the new segment . . .") not present in claim 23. Claims 1, 23, and 37 are method claims. Claims 12, 30, and 42 are computer readable media versions of claims 1, 23, and 37, respectively. Thus, claims 1 and 37 are exemplary of the claimed subject matter, and are reproduced below (emphases added):

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

1. A method for a first computer to generate an update for transmission to a second computer that permits the second computer to generate a copy of a current version of a file comprised of a first plurality of file segments from a copy of an earlier version of the file comprised of a second plurality of file segments, such that each file segment corresponds to a portion of its respective file, the method comprising the steps of:

for each segment of the current version of the file,

(a) searching an earlier version of a signature list corresponding to an earlier version of the file for an old segment signature which matches a new segment signature corresponding to the segment;

(b) if step (a) results in a match, writing *a command* in the update for the second computer *to copy* an old segment of the second computer's copy of the earlier version of the file into the second computer's copy of the current version of the file, wherein the old segment corresponds to the segment for which a match was detected in step (a); and

(c) if step (a) results in no match, writing *a command* in the update for the second computer *to insert* a new segment of the current version of the file into the second computer's copy of the current version of the file;

wherein the new segment of the current version of the file is written into the update and the unchanged segment is excluded from the update; and

wherein steps (a) through (c) are performed by the first computer, without interaction with the second computer, in response to the first computer detecting a change between the current version of the file and the earlier version of the file.

4

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

37. A method for a first computer to provide updates for transmission to a second computer that permits the second computer to obtain most recent versions of files, the method comprising the steps of:

(a) determining whether the second computer has *a latest version* of a file, wherein said determining is performed by the first computer without interaction with the second computer;

(b) generating an update, if the second computer does not have a latest version of the file, wherein said generating is performed by the first computer without interaction with the second computer; and

(c) transmitting the update from the first computer to the second computer.

## C. Related Proceedings

Petitioners indicate that the '799 Patent was the subject of the following terminated *inter partes* reviews before the Board:  Oracle Corp. v. Clouding IP, LLC, IPR2013-00073[2] and Oracle Corp. v. Clouding IP, LLC, IPR2013-00261.  Pet. 4.  Petitioners indicate that the '799 Patent is the subject of the following co-pending federal district court cases:  *Clouding IP, LLC v. EMC Corp., et al.*, Case No. 1:13-cv-01455 (D. Del.); *Clouding IP, LLC v. Dropbox Inc.*, Case No. 1:13-cv-01454 (D. Del.); *Clouding IP, LLC v. SAP AG, et al.*, Case No. 1:13-cv-01456 (D. Del.); *Clouding IP, LLC v. Verizon Inc.*, Case No. 1:13-cv-01458 (D. Del.); *Clouding IP, LLC v. Rackspace, Hosting Inc.*, Case No. 1:12-cv-00675 (D. Del.); *Clouding IP, LLC v. Amazon.com Inc.*, Case No. 1:12-cv-00641 (D. Del.); *Clouding IP, LLC v. Oracle Corp.*, Case No. 1:12-cv-00642 (D. Del.); *Clouding IP, LLC*

---

[2] Petitioners identify IPR2012-00073 as a related matter.  Pet. 4.  However, IPR2013-00073 is the related *inter partes* review involving the '799 Patent.

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

*v. Google Inc.*, Case No. 1:12-cv-00639 (D. Del.). Pet. 4. Petitioners
indicate that the '799 Patent also was the subject of the following terminated
federal district court cases: *Clouding IP, LLC v. Apple Inc.*, Case No. 1:12-
cv-00638 (D. Del.); and *Clouding IP, LLC v. Microsoft Corp.*, Case No.
1:12-cv-00640 (D. Del.). Pet. 4.

### D. Asserted Grounds of Unpatentability

The Board instituted *inter partes* review on the following asserted
grounds of unpatentability under 35 U.S.C. §§ 102 and 103 (Dec. on Inst.
29–30):

| References | Basis | Challenged Claim(s) |
|---|---|---|
| Williams[3] | § 102(e) | 1, 12, 23, 24, 30, 31, 37, and 42 |
| Williams and Miller[4] | § 103(a) | 5–10 and 16–21 |
| Balcha[5] | § 102(e) | 37 and 42 |
| Balcha and Miller | § 103(a) | 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31 |
| Balcha, Miller, and Freivald[6] | § 103(a) | 6–8 and 17–19 |
| Balcha and Freivald | § 103(a) | 37 and 42 |

## II. ANALYSIS

### A. Claim Construction

The Board interprets claims of an unexpired patent using the broadest
reasonable construction in light of the specification of the patent. 37 C.F.R.

---

[3] U.S. Patent No. 5,990,810, issued Nov. 23, 1999 (Ex. 1006) ("Williams").
[4] U.S. Patent No. 5,832,520, issued Nov. 3, 1998 (Ex. 1004) ("Miller").
[5] U.S. Patent No. 6,233,589 B1, issued May 15, 2001 (Ex. 1003) ("Balcha").
[6] U.S. Patent No. 5,898,836, issued Apr. 27, 1999 (Ex. 1005) ("Freivald").

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

§ 42.100(b); *see* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).  Claims are to be given their broadest reasonable interpretation consistent with the specification, reading the claim in light of the specification as it would be interpreted by one of ordinary skill in the art. *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004).

Although the parties argue other terms, for purposes of this decision, we find it necessary to construe explicitly only "update," "writing a command . . . to copy," and "determining whether the second computer has a latest version of a file, wherein said determining is performed by the first computer without interaction with the second computer."  We provide the bases for the construction of each of the explicitly construed terms below.

### 1.    "update"

Petitioners propose construing "update" as "information for updating a file or an up-to-date version of a file."  Pet. 15 (citing Ex. 1010, 10). Patent Owner does not propose a construction for "update" in its Patent Owner Response.

The claim term "update" has the following dictionary definition: "current information for updating something" or "*an up-to-date version*, account, or report."[7]  We do not find an explicit definition in the Specification of the '799 Patent for an update, nor do we find anything in the Specification inconsistent with a construction encompassing an up-to-date version of a file.  Therefore, in the context of file synchronization, we construe the claim term "update" broadly, but reasonably, as information for updating a file or an up-to-date version of a file.

---

[7] MERRIAM-WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/update (last visited Feb. 11, 2014) (emphasis added).

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

>    2.    *"writing a command . . . to copy"*

Each of claims 1, 12, 23, and 30 recites the following claim phrase:
"writing *a command* in the update for the second computer *to copy* an old
segment of the second computer's copy of the earlier version of the file into
the second computer's copy of the current version of the file."  Ex. 1001,
claims 1, 12, 23, 30 (emphasis added).  Hereinafter, we refer to this claim
phrase as "writing a command . . . to copy."

Petitioners propose construing "a command to copy" as "an
instruction that causes the computer to duplicate information or data."  Pet.
15 (citing Ex. 1010, 11).  Patent Owner asserts a "plain meaning reading of
[the writing a command . . . to copy phrase] demands that a *command to
copy* be written in the update that is used by the second computer to generate
a copy of the current version of the file."  PO Resp. 10.

We note that the recited "writing a command . . . to copy" language
merely requires that a command, which causes the second computer to copy
a portion of an earlier version of a file into a current version of the file, be
written in the update.  The claim does not limit the command to a specific
format.  Therefore, we broadly, but reasonably, construe "writing a
command . . . to copy" as inserting an instruction into the update that causes
the second computer to duplicate information or data from an earlier version
of a file into a current version of a file.

>    3.    *"determining whether the second computer has a latest
>    version of a file, wherein said determining is performed
>    by the first computer without interaction with the second
>    computer"*

Neither Petitioners nor Patent Owner have proposed explicitly a
construction of "determining whether the second computer has a latest

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

version of a file, wherein said determining is performed by the first
computer without interaction with the second computer" (the "determining
limitation").  We find the language of the determining limitation is
sufficiently clear that the plain and ordinary meaning is the proper
construction.  Nevertheless, because the determining limitation is central to
the disputes in this proceeding, we address two key components of the
determining limitation to explain how an ordinarily skilled artisan would
have understood the determining limitation when read in the context of the
Specification of the '799 Patent at the time of invention.  In particular, we
will discuss how an ordinarily skilled artisan would have understood what
the latest version of a file is, and what it means for the determination to be
"performed by the first computer *without interaction with the second
computer*."

Patent Owner appears to argue that the determining limitation requires
the first computer to be absolutely certain that the version on the second
computer is not the most recent version of the file.  *See, e.g.,* PO Resp. 7–8
(arguing that claims 37 and 42 do not allow for the possibility that a more
recent file would be overwritten by an older file), 38 (distinguishing prior art
where "computer E1 cannot be certain whether or not computer E2 stores a
latest version of the subject file").

In its arguments against Petitioners' challenges, Patent Owner
provides examples of how uncertainty could occur in the prior art.  *See, e.g.,*
PO Resp. 7 ("Balcha only discloses detecting whether a base file has been
modified, regardless of when that modification may have occurred relative
to other copies of the same base file"), 25 ("Freivald is unconcerned with

9

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

whether or not a subscribed client has a latest version of a Web page (or any version at all for that matter), and sends notifications whenever qualifying changes in a Web page have been detected, regardless of whether the modifications reflect the latest version of the file or not"), 38 ("Williams is both anticipating and accommodating situations in which computer E2 may store a different, but not necessarily a latest, version of a file than computer E1").  Patent Owner asserts inappropriate file updating is avoided in claims 37 and 42 "by determining whether the second computer has a latest version of a file and, in this way, establishes that the latest version of the file will not be overwritten by changes to a file that occurred previously to the changes of the latest version of the base file simply because the files are not the same (i.e., one of the files has been modified)."  PO Resp. 8.  Patent Owner cites to Dr. Mohaptra's Declaration[8], which uses the exact same language and provides no further explanation as to why the determining limitation should be construed to prevent the inappropriate file updating that is allegedly an issue only in the prior art.  Ex. 2009 ¶ 17.

Petitioners explain that there is nothing in the '799 Patent that prevents a copy of a subject file from being updated on a client, but that an ordinarily skilled artisan would have understood that the system was not intended to operate in that way.  Hr'g Tr. 7:23–8:10.  Petitioners further argue that claims 37 and 42 recite the determining is done "without interaction with the client[/second computer]."  *Id.* at 8:16–18.  Moreover, Petitioners explain that the '799 Patent describes the process of the determining limitation

---

[8] Dr. Prasant Mohaptra is Patent Owner's declarant, whose Declaration was submitted as Exhibit 2009.

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

assuming that the system is operated normally, and that the server can use traditional mechanisms (e.g., comparing time stamps) to determine whether the second computer has a current version of the file. *Id.* at 8:16–24. Thus, Petitioners implicitly assert that a person having ordinary skill in the art would not have understood the determining limitation, which requires the determining to be done *without interaction with the second computer*, to require an absolute certainty that the second computer have the latest version. *Id.* at 8:16–13:20. Rather, Petitioners implicitly assert that the proper construction of the determining limitation is that the first computer, assuming normal operation of the system and using techniques known to those of ordinary skill in the art, detects whether there is a difference between a current version and an old version of the file at the first computer, and updates the second computer if there is a difference. *Id.*

With respect to the latest version, a review of the Specification of the '799 Patent reveals only one occurrence of the term "latest." Ex. 1001, 13:12–14 ("For the next file change, the server will take yet another snapshot and compare it against the latest snapshot and so on."). The '799 Patent does, however, consistently refer to updating an old version of a file to a current version of a file.

Although Patent Owner asserts that claims 37 and 42 would not allow a newer file to be overwritten by an older file (PO Resp. 7–8), Patent Owner does not point to evidence sufficient to support such a restriction. Patent Owner does not explain how the recited language requires an implementation that prevents issues with transit delays, tampering, or other uncertainties with respect to the first computer's most recent version not

11

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

being as recent as another version of the file.  Patent Owner simply points to the recited language as the explanation for why claims 37 and 42 do not suffer from the same problems as the prior art.

The closest Patent Owner comes to providing support for its proposed construction is its argument, without citation to supporting evidence, that claims 37 and 42 use the timestamp of when a change was made (rather than when the server received the change) to determine the latest version.  Hr'g Tr. 29:15–31:13.  Patent Owner explains that, even when using the timestamp of when a change was made, the server relies "upon a comparison of its *own* time stamps" because "the server does not have the time stamps for the client computer."  Hr'g Tr. at 19:12–17 (emphasis added).  Nevertheless, even accepting the argument that the server uses the timestamp of when a change was made, as opposed to received, by the server, there are two issues.  First, in the example provided by Patent Owner, the first computer may receive a second update (where the change was made later) prior to receiving a first update (where the change was made earlier) due to network latency.  *Id.* at 30:4–9, 30:21–31:9.  There is no disclosure in the '799 Patent indicating that an evaluation made by the first computer, in the time between receiving the first and second updates, would result in a determination that the second update was the latest version.  This is inconsistent with Patent Owner's position that the server is always using the latest change to provide an update.  Second, regardless of when updates are made, there is no recited restriction on how the first computer determines what version is the current or latest version.

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

There are various references throughout the '799 Patent that discuss the first computer, or server, determining whether an update file needs to be sent to the second, or client, computer(s). *See, e.g.*, Ex. 1001, Abstract ("The server periodically monitors the subscription file to determine if it has been altered before generating an update file"), 4:32–34 ("The update file is only generated when the server computer determines that the subscription file has changed . . . [t]he user determines the periodicity of the checks to determine if the file has been altered"), 6:51–55 ("the user then determines the polling or monitoring interval for the server to check for changes and also what to do when changes occur, i.e., package and send file changes or simple notification"). The '799 Patent also discloses that the server periodically monitors files or folders to which clients subscribe for changes in order to determine whether an update needs to be generated. *See, e.g., id.* at 3:41–44, 4:32–39, 7:56–57, 9:28–31. One example provided in the '799 Patent is that the server "polls files or subfolders at either [sic] user-defined intervals for any changes to date, time stamps." *Id.* at 6:59–60. Each of these descriptions explains that the server (the first computer) makes a determination without comparing the subject file (or its timestamp) to the version of the file stored at the client (the second computer) (or its timestamp).

In light of the considerations discussed above, we do not see anything that would lead us to conclude that the proper construction of the determining limitation requires absolutely certainty. From the perspective of the first computer, the latest version, as recited in claims 37 and 42, refers to the current version accessible by the first computer, as determined by the

13

first computer at the time a check is made. Thus, at the point in time when the first computer makes its determination, the first computer merely needs to determine whether it has already sent its current version to the second computer. Considering all of the above, an ordinarily skilled artisan would have understood the plain and ordinary meaning of the "determining limitation" to be determining, by the first computer using known techniques based on information it has access to and without interaction with the second computer, whether the last version of the subject file sent to the second computer is not the same as the current version of the subject file.

### B. Submitted Evidence

#### 1. Williams (Ex. 1006)

Williams describes a fine-grained incremental backup system and process. Ex. 1006, 19:26–22:14. Figure 25 of Williams is reproduced below:



Figure 25 of Williams illustrates the backup process for two network computers.

Williams describes that a file on computer E1 is backed up to computer E2, such that both E1 and E2 have a copy of the same version of the file, referred to as Y. When the file is modified, computer E1 now has a

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

new (current) version of the file, referred to as X. As shown in Figure 25 of Williams, at that time each of the network computers (E1 and E2) has a version of the same file (X and Y, respectively). Williams then determines the information to send from computer E1 to E2 necessary for E2 to generate a copy of X and sends that incremental backup information in a file, referred to as D, from computer E1 to computer E2. Computer E2 subsequently may generate a copy of the current version of the file, X, by using its prior version of the file, Y, and the incremental backup information file, D. Ex. 1006, 19:29–34, 19:63–20:2.

For further improvement, Williams indicates that copies of the previous versions of the file system should be retained. Ex. 1006, 21:62–65. This means that computer E2 should maintain both versions of the file, Y (the previous version) and X (the current version) when generating the current version. *Id.* Therefore, computer E2 eventually may store every prior version of that file.

As explained in Williams, computer E1 compares the hash of the old version of the file, Y, against the hash of current version of the file, X, to determine whether the file has changed. Ex. 1006, 19:44–46. If the file has changed, computer E1 partitions the current version of the file into subblocks, and compares the hashes of these subblocks with the hashes of previous version of the file that are stored in shadow file S of computer E1, to find all identical hashes. Ex. 1006, 19:48–51. "Identical hashes identify identical subblocks in [version] Y that can be transmitted by reference." Ex. 1006, 19:51–52. Computer E1 then transmits the incremental backup file D as a mixture of raw subblocks and references to subblocks whose

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

hashes appear in the shadow file S and which are known to appear as subblocks in the prior version of the file, Y.  Ex. 1006, 19:52–55.

To reconstruct a duplicate of the current version of the file, X, from the prior version of the file, Y, and incremental backup file, D, computer E2 partitions Y into subblocks and calculates the hashes of subblocks.  Ex. 1006, 19:66–20:1.  "It then processes the incremental backup information, copying subblocks that were transmitted raw and looking up the references" in Y.  Ex. 1006, 20:2–5.

### 2. Miller (Ex. 1004)

Miller describes a method and system for using small difference ("diff") files to update or revise large computer files.  Ex. 1004, 1:11–13. The diff files are small files that indicate the differences between the large computer files and preexisting computer files.  *Id.* at 1:13–15.  Figure 1 of Miller, reproduced below, illustrates how the process works.



IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

Figure 1 of Miller illustrates the process of generating a diff file at a first computer system by identifying differences between an old file and a new file, communicating the diff file to the second computer system over a communication path, and generating a copy of the new file at a second location using the diff file and a copy of the old file present at the second location.

Miller's diff file indicates changes between the old file and the new file using a minimal number of bytes. *Id.* at 2:21–24, 31–33. Miller's diff file is comprised of copy and insert commands. *Id.* at 13:24–30. Miller's first computer system then communicates the diff file to the second computer system, using any means for communicating between computer systems, including e-mail. *Id.* at 5:10–17. The second computer system then generates a new file, either when invoked explicitly or through receipt of a self-extracting execution file, copying segments from its copy of the old file and segments from the diff file. *Id.* at 15:25–43.

### 3. *Balcha (Ex. 1003)*

Balcha discloses a method for synchronization of files. Ex. 1003, 1:5–7. In particular, a synchronized file exists on two different servers, and changes made to one file must be reflected in the other file. Ex. 1003, 1:42–44. Figure 1 of Balcha, reproduced below, illustrates a computer network with two servers using file synchronization.



FIG. 1

17

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

As shown in Figure 1 of Balcha, servers (22 & 24) are interconnected via a network 26, and each server (22 & 24) maintains a copy of a base file (21 & 27) and a base signature file (20 & 28). Ex. 1003, 4:51–53. The base files (21 & 27) should be identical, but either base file can be modified at either server. Ex. 1003, 4:53–61. *Upon detection of a modification to the file*, the detecting server (e.g., server 22), uses the respective base signature file (e.g., base signature file 20) to generate a new delta file, and communicates the delta file over network 26 to server 24. Ex. 1003, 4:61–66 (emphasis added). Server 24 uses the delta file to update the base file 27, and recalculates the base signature file 28. Ex. 1003, 4:66–67. As a consequence, the base files on the servers will stay in synchronization with minimal transfer of data over network 26. Ex. 1003, 5:1–3.

Figure 3 of Balcha is reproduced below:



Figure 3 of Balcha illustrates the relationship of the files.

Referring to Figure 3 of Balcha, the base signature file (42) contains a plurality of cyclic redundancy check (CRC) values derived from the data contained in the base file (38). Ex. 1003, 3:1–3, 3:21–28, 7:46–49. When a revised version of the base file (44) is created, a revised signature file (48), including a plurality of revised bit patterns, is generated from the revised file

18

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

(44). Ex. 1003, 3:4–6, 7:49–53. "*Each revised bit pattern is compared to the base bit patterns in base signature file 42.*" Ex. 1003, 7:57–59 (emphasis added). "For each revised bit pattern that matches a base bit pattern in base signature file 42, it is stored in revised signature file 48, along with an offset indicating the location in revised file 44 of the beginning of the block of data represented by the revised bit pattern." Ex. 1003, 7:59–63.

Based on the differences between the base signature file and the revised signature file, a delta file reflecting the differences between the base file and the revised file is generated. Ex. 1003, 3:7–10, 3:50–54. The delta file contains primitives, such as insert, modify, and delete primitives, which are commands that can be applied to a previous version of the file to generate the revised file. Ex. 1003, 3:54–58.

### 4. Freivald (Ex. 1005)

Freivald describes a change-detection web server that automatically checks pages for changes. Ex. 1005, Abstract. Freivald discloses a subscription service in which users that wish to be notified of changes to Web pages or portions thereof may register those pages. *Id.* at 7:3–15. An associated subscription server, referred to as a minder, periodically checks to see if the registered pages have changed and, upon detecting changes, notifies the user by sending an email. *Id.* at 5:18–43.

### 5. Update/Synchronization Schemes

Both parties agree that retain-by-default and discard-by-default are the two schemes used in file synchronization or file backup. *See, e.g.,* Pet. 51; Ex. 1007 ¶¶ 22–27, 46–48; Hr'g Tr. 17:11–18:4. Briefly, retain-by-default

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

indicates that, when generating a new version of the file, each portion of the old version of the file is kept unless the update explicitly indicates removing that portion. Conversely, discard-by-default indicates that, when generating a new version of a file, each portion of the old version of the file is discarded unless the update explicitly indicates keeping that portion. *See* Ex. 1007, ¶¶ 22–27.

Although the specific commands inserted into an update file by the first computer differ, the operations executed by the second computer upon receipt of the update file are the same. *Id.* ¶¶ 22, 26, 46. Put another way, the schemes merely differ in whether the identified blocks are those to be kept or those to be discarded, whereas the actual instructions executed at the second computer depend on the goal that the second computer is programmed to accomplish, not the commands inserted into the update file. *Id.*

In particular, if the second computer is programmed to generate a new backup file upon receipt of an incremental update file (retaining the prior version backup file), the second computer will interpret the insert instructions in the update file to copy the new sections from the update file into the new backup file. *Id.* ¶¶ 25, 37. If the update file uses copy commands (discard-by-default scheme), the second computer will interpret copy commands in the update file such that the second computer will copy the identified sections from the prior version of the backup file, ignoring the sections not identified as needing to be copied. *Id.* ¶ 57. Similarly, if the update file uses delete commands (retain-by-default scheme), the second computer will interpret the delete instructions to ignore the sections

20

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

identified, thus retaining sections not identified to be deleted from the prior version backup file by copying them from the prior version to the version being generated. *Id.* ¶¶ 35–36. Therefore, generating update files using either a retain-by-default scheme or a discard-by-default scheme may meet the recited "writing a command . . . to copy" because either a copy command or a delete command may cause the second computer to duplicate information or data from an earlier version of a file into a current version of a file.

### C. Analysis of Whether Claims 1, 12, 23, 24, 30, 31, 37, and 42 Are Unpatentable As Anticipated by Williams Under 35 U.S.C. § 102(e)

The Board instituted trial on Petitioners' challenge of anticipation of claims 1, 12, 23, 24, 30, 31, 37, and 42 by Williams under 35 U.S.C. § 102(e). Dec. on Inst. 17–20, 29. As described above, one aspect of Williams is directed to a fine-grained incremental backup system. Ex. 1006, 19:26–22:14. Petitioners allege that each element of claims 1, 12, 23, 24, 30, 31, 37, and 42 is disclosed by Williams and provide detailed analysis and claim charts mapping the limitations of the claims to disclosures within Williams, including mapping the incremental backup file D to the recited update, computer E1 to the recited first computer, computer E2 to the recited second computer, the file's subblocks to the recited segments, and the shadow file to the recited signature list. Pet. 32–40. Moreover, as argued by Petitioners, Williams discloses placing commands in the incremental backup file, or the update, which allow computer E2 to generate the new version of the file, X, from the old version of the file, Y, and the incremental backup file, D. *Id.*; Ex. 1006, 19:45–20:5. Williams also discloses that no

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

incremental backup file needs to be sent to computer E2 if the file has not changed[9], which can be determined by comparing the current file to the shadow file or by evaluating "the modification date file attribute of the file." Ex. 1006, 19:45–49; Pet. 38–39.

### 1. Claims 1, 12, 23, 24, and 30

Patent Owner argues claims 1, 12, 23, 24, 30, and 31 are not anticipated because "Williams does not teach a command to copy or a command to insert as recited in independent claims 1, 12, 23, and 30 and construed by the Board." PO Resp. 26 (emphasis omitted). In particular, Patent Owner asserts that the incremental backup file includes raw subblocks not present in the original version of the file and references to subblocks that were present in the original version of the file and should be retained, but that no "command to copy (or it[s] equivalent)" is present in the incremental backup file. *Id.* at 27–28. Patent Owner argues Williams does not provide any other information regarding the references to the new subblocks and that those references to new subblocks are not commands to copy. Hr'g Tr. 17:7–10. Patent Owner further asserts that Williams merely updates a prior version of a file to become a copy of the current version of the file, so no action of copying would result from any instructions or data in the incremental backup file. *Id.* at 28. Patent Owner argues the distinction between the claims at issue and Williams's disclosure focuses on "the

---

[9] Patent Owner asserted that Williams's update process "takes place without regard to whether or not the other computer has the latest version of the file." Hr'g Tr. 20:9–14. To the extent Patent Owner is asserting that Williams backs up a file even if it has not changed, that is incorrect. Ex. 1006, 19:47–49 ("If X [on computer E1] hasn't changed, [and X and Y are still the same], there is no need to perform any further backup action.")

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

operations that result from the application of [the increment backup] file as taught by Williams," not the literal language of an instruction in Williams's incremental backup file. *Id.* at 29.

We find Patent Owner's argument unavailing. Petitioners pointed to portions of Williams that disclose the second computer generating a copy of the current version of the file, X, using the old version of the file, Y, stored at the second computer, and the incremental backup file, D, received from the first computer. Pet. 33, 35–36 (citing Ex. 1006, 19:66–20:9, Fig. 25).

Notwithstanding Patent Owner's argument that the distinction focuses on the resultant operations rather than the language of the instruction in the backup file, Patent Owner implies that only a discard-by-default scheme can disclose the "writing a command . . . to copy" limitation. *See* Hr'g Tr. 17:7–18:25. Patent Owner reiterates that Williams merely indicates that its incremental backup file includes "references to file [segments], and doesn't explain the references." *Id.* at 18:15–17. Patent Owner argues that, because Williams is equally likely to implement a retain-by-default scheme or a discard-by-default scheme, Williams does not disclose inserting a command to copy, either explicitly or inherently. *Id.* at 18:17–25.

First, Patent Owner's argument that each scheme is equally likely is not persuasive. Petitioners point to Williams's disclosure that the incremental backup file sends references to blocks in the old version, Y, that match blocks in the current version, X and, therefore, should be included when generating a copy of the current version, X, at the second computer. Pet. 36 (citing Ex. 1006, 21:5–11). Identifying blocks that are to be kept (as opposed to identifying blocks to be discarded) is a characteristic of a

23

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

discard-by-default scheme, nullifying Patent Owner's argument that
Williams just as likely could be using a retain-by-default scheme.

Nevertheless, as discussed above, the scheme used does not inform us
whether the command inserted into the update, or incremental backup file,
causes the second computer to duplicate data or information from the old
version of the file into the second computer's copy of the current version of
the file, as required by the "writing a command . . . to copy" limitation.  In
order to determine that, we need to look at what the second computer does
with the incremental backup file and, in particular, whether the second
computer copies data segments from an old version of the file to a copy of
the current version of the file.  Patent Owner acknowledges that "the
semantics are important" with respect to whether a new file is generated for
the copy of the current version of the file at the second computer or whether
the old version of the file is merely replaced with the new version.  Hr'g Tr.
27:10–16.

We look to the relevant portions of Williams cited by both parties to
understand what Williams's second computer does with the incremental
backup file.  Williams "processes the incremental backup information,
copying subblocks that were transmitted raw and looking up the references
either in Y or in the part of X already reconstructed."  Ex. 1006, 20:2–5.
Contrary to Patent Owner's argument that the new version merely replaces
the old version, that description in Williams provides some evidence that Y
and X are separately co-existing files at the second computer.  Moreover, as
addressed in the discussion of Williams above, copies of previous versions
may be retained, such that computer E2 may maintain both its copies of old

24

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

versions of the file, e.g., $Y_1$–$Y_n$, and its copy of the current version of the file, X.  Ex. 1006, 21:62–67.  The evidence therefore supports the finding that Williams's second computer, E2, does duplicate data or information as a result of the commands Williams's first computer, E1, inserted into the incremental backup file, D, meeting the recited "writing a command . . . to copy."

Patent Owner also argues "[t]he copying that [Petitioners] referred to was a copying of information into the update file, but that is not the copying referenced in the claim language.  The claim language represents copying occurring at the second computer."  Hr'g. Tr. 16:14–17.  It is unclear to which of Petitioners' arguments Patent Owner refers.  To the extent Patent Owner argues the portions of Dr. Mohaptra's deposition testimony cited by Petitioners regarding how Williams's copying works (*see* Ex. 1021, 3–5 (quoting Ex. 1019, 42:21–25, 44:5–8, 44:20–45:8) refer to copying information into the update file, that argument is not persuasive.  For example, Dr. Mohaptra agreed that both blocks from the old version of the file, Y, on computer E2 and blocks from the incremental update file, D, are copied into X.  Ex. 1019, 41:8–45:8.  There is no ambiguity in Williams that only computer E1 generates the update file and only computer E2 generates a version of the file using blocks from the update and from an old version of the file.  *See* Ex. 1006, 19:27–22:14.

We have reviewed the Petition, the Patent Owner Response, and Petitioners' Reply, as well as the relevant evidence discussed in those papers.  We are persuaded, by a preponderance of the evidence, that claims 1, 12, 23, 24, 30, and 31 are anticipated by Williams under 35 U.S.C. § 102.

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

### 2.  *Claims 37 and 42*

Patent Owner argues claims 37 and 42 are not anticipated because "Williams does not teach determining whether the second computer has a latest version of a file and generating an update if the second computer does not have a latest version of a file."  PO Resp. 38.  In particular, Patent Owner asserts Williams "generates the update when the backup system determines that a backup should be made," and that "computer E1 cannot be certain whether or not computer E2 stores a latest version of the subject file."  *Id.*  Patent Owner further argues that "Williams is a back-up system, and the back-up operates according to a schedule . . . whether or not it's the latest version," and that Williams does not discuss time stamps.  Hr'g Tr. 20:1–8.

As explained above, our construction of the determining limitation does not require absolute certainty that the current version is the latest version.  Moreover, contrary to Patent Owner's arguments, Petitioners point out that Williams discloses determining whether a file needs to be updated before executing the backup procedure and further discloses using time stamps to determine whether the second computer has the current version. Hr'g Tr. 40:7–20, 42:15–43:7 (citing Ex. 1006, 19:47–49, 22:10–14).

We have reviewed the Petition, the Patent Owner Response, and Petitioners' Reply, as well as the relevant evidence discussed in those papers.  We are persuaded, by a preponderance of the evidence, that claims 37 and 42 are anticipated by Williams under 35 U.S.C. § 102.

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

### D. Analysis of Whether Claims 5–10 and 16–21 Are Unpatentable as Obvious Over Williams and Miller Under 35 U.S.C. § 103(a)

The Board instituted trial on Petitioners' challenge of obviousness of claims 5–10, which depend ultimately from claim 1, and 16–21, which depend ultimately from claim 12, over Williams and Miller.  Dec. on Inst. 20, 30.  Claims 16–21 are similar in substance to claims 5–10, but claims 16–21 recite computer readable media.  Petitioners allege that each additional element of claims 5–10 and 16–21 is taught by the combination of Williams and Miller, provide detailed analysis and claim charts mapping the limitations of the claims to disclosures of Williams and Miller, and provide reasons for combining Williams and Miller.  Pet. 41–45.  Patent Owner argues only that claims 5–10 and 16–21 are patentable for the same reasons argued with respect to claims 1 and 12, which we addressed above.

Claims 5 and 16 recite an additional limitation relating to sending the update as an executable attachment in an e-mail.  Petitioners allege that the additional limitation in claims 5 and 16 is taught by Miller, which "discloses a system, method, and file structure for transmitting a difference file from a first computer to a second computer, *as an executable file*, which allows the second computer to create a copy of the most up-to-date version of a monitored file using the second computer[']s copy of an old version of the monitored file and the executable difference file."  Pet. 42–43 (emphasis added) (citing Ex. 1004, 2:38–46, 5:9–16, 5:35–39, and 15:41–43).  Petitioners argue combining Williams and Miller is the mere substitution of one known method for another with predictable results, and that such a combination would have been obvious because Williams does not restrict

27

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

the method of communication, and using an e-mail would have been a known method of communication.  Pet. 41–42.

We have reviewed the Petition, the Patent Owner Response, and Petitioners' Reply, as well as the relevant evidence discussed in those papers.  We are persuaded, by a preponderance of the evidence, that claims 5–10 and 16–21 are obvious in view of the combination of Williams and Miller under 35 U.S.C. § 103.

### E. Analysis of Whether Claims 37 and 42 Are Unpatentable As Anticipated by Balcha Under 35 U.S.C. § 102(e)

The Board instituted trial on Petitioners' challenge of anticipation of claims 37 and 42 by Balcha under 35 U.S.C. § 102(e).  Dec. on Inst. 23–24, 30.  As described above, Balcha is directed to file synchronization.  *See, e.g.,* Ex. 1003, 1:5–7, 1:42–44.  Petitioners allege that each element of claims 37 and 42 is disclosed by Balcha and provide detailed analysis and claim charts mapping the limitations of the claims to disclosures within Balcha, including mapping Balcha's delta file to the update, Balcha's detecting server to the recited first computer, Balcha's server that receives the delta file to the recited second computer, Balcha's base file to the recited file, Balcha's determination of whether a base file has been revised by using its own base signature file to the recited determining limitation, and Balcha's communication of the delta file to the receiving server to the recited transmission of the update.  Pet. 26–28.

Patent Owner argues Balcha does not disclose the determining limitation because Balcha "discloses detecting a modification to the file without regard to whether the modified file is, indeed, the latest version of the file" and "the detection of the modification of base file 21 is in no way

28

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

related to, or dependent upon, a determination that base file 21 is the latest version of the base file." PO Resp. 7.

Based on our construction of the determining limitation, particularly in light of the fact that the determining limitation recites that the determination is made by the first computer without interaction with the second computer, we do not agree with Patent Owner that Balcha fails to disclose the determining limitation.

We have reviewed the Petition, the Patent Owner Response, and Petitioners' Reply, as well as the relevant evidence discussed in those papers. We are persuaded, by a preponderance of the evidence, that claims 37 and 42 are anticipated by Balcha under 35 U.S.C. § 102.

### F. Analysis of Whether Claims 37 and 42 Are Unpatentable as Obvious Over Balcha and Freivald Under 35 U.S.C. § 103(a)

The Board instituted trial on Petitioners' challenge of obviousness of claims 37 and 42 over Balcha and Freivald. Dec. on Inst. 28–30. Petitioners allege that each element of claims 37 and 42 is taught by Balcha, and that Freivald provides a further teaching with respect to determining whether a second computer has a latest version. Petitioners provide detailed analysis and claim charts mapping the limitations of the claims to disclosures of Balcha and Freivald, and provide reasons for combining Balcha and Freivald. Pet. 45–47, 54–57. Patent Owner argues that neither Balcha nor Freivald teaches the determining limitation recited in claims 37 and 42. Balcha's teachings with respect to the determining limitation were addressed above.

Specifically, Petitioners assert that Freivald discloses a minder that, "without interaction with a client computer, determines whether the client

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

computer has the most recent version of a web page document and, if the client's version is out of date, transmits an updated copy of the document to the client." *Id.* at 55–56 (citing Ex. 1005, 6:61–67, 7:25–39). Petitioners also argue Freivald discloses comparing revision dates or time stamps to determine whether the second computer has a latest version of the file, in the same way as described in the '799 Patent. *Id.* at 56 (citing Ex. 1001, 6:57–63, Ex. 1005, 2:31–36). Petitioners argue a skilled artisan would have been motivated to combine Balcha and Freivald because they both serve the purpose of keeping remote versions of files up-to-date, and Freivald's change-detection server would have been a convenient way to detect changes in Balcha's base files. *Id.* at 46–47. Petitioners further argue one would have combined Balcha and Freivald because Freivald's change-detection method was one of a limited number of known ways to detect whether a file had been modified such that an update would need to be distributed, the use of which would have been a known solution providing a predictable result. *Id.* at 47.

We have reviewed the Petition, the Patent Owner Response, and Petitioners' Reply, as well as the relevant evidence discussed in those papers. As discussed above, we are persuaded that Balcha discloses each of the limitations for which it is relied on. Moreover, we are persuaded, by a preponderance of the evidence, that Balcha and Freivald is a proper combination, that Freivald provides a further teaching of a first computer determining whether a second computer has a latest version of a file and, therefore, that claims 37 and 42 are obvious in view of the combination of Balcha and Freivald under 35 U.S.C. § 103.

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

### G. Analysis of Whether Claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31 Are Unpatentable Obvious Over Balcha and Miller Under 35 U.S.C. § 103(a)

The Board instituted trial on Petitioners' challenge of obviousness of claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31 over Balcha and Miller. Dec. on Inst. 24–26, 30. Claims 12, 16, 20, 21, 30, and 31 differ from claims 1, 5, 9, 10, 23, and 24, respectively, only in that claims 12, 16, 20, 21, 30, and 31 recite computer readable media rather than methods. Petitioners allege that each element of claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31 is taught by the combination of Balcha and Miller, provide detailed analysis and claim charts mapping the limitations of the claims to disclosures of Balcha and Miller, and provide reasons for combining Balcha and Miller. Pet. 16–25.

Specifically, with respect to claims 1, 12, 23, 24, 30, and 31, Petitioners assert that Balcha discloses each limitation and that Miller further discloses inserting a copy command into a difference file when it finds matching segments. *Id.* at 21–22 (citing Ex. 1004, 5:52–56), 25–26. Petitioners also argue Miller discloses each additional limitation recited in dependent claims 5, 9, 10, 16, 20, and 21. *Id.* at 23–26. In particular, Petitioners map Miller's self-extracting execution file sent in an electronic mail message that generates a copy at the second computer to "transmitting the update to the second computer as an executable attachment . . .," recited in claims 5 and 16. *Id.* at 23–24, 26 (citing Ex. 1004, 5:9–16, 5:35–39, 15:41–43). Petitioners also point to specific sections of Miller that disclose updating either software or a document as recited in claims 9 and 20 and claims 10 and 21, respectively. *Id.* at 24–26 (citing Ex. 1004, 1:42–44,

31

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

2:21–24, 5:21–26).  Petitioners argue a skilled artisan would have been motivated to combine Balcha and Miller because they both use delta files to allow remote computers to update versions of a file, and because updating software, as disclosed by Miller, in place of Balcha's data files is just the substitution of one well-known file type for another with predictable results. *Id.* at 17.  Finally, Petitioners argue that copying is one of a limited number of options for updating an old version to a new version and that it was within the skill level of an ordinarily skilled artisan to elect to use the copy mechanism.  Hr'g Tr. 45–46.

Patent Owner argues that Balcha does not teach a command to copy because it uses only insert, modify and delete primitives, and that the data segments that are the same between versions merely remain in the new version of the file, without needing to copy those segments.  PO Resp. 12–13.  Patent Owner further argues that Balcha, therefore, has no need for a copy primitive so Balcha cannot teach or suggest writing a command to copy data.  *Id.* at 13.  Patent Owner admits that the combination of Balcha and Miller teaches each of the recited limitations, but argues one would not combine Balcha with Miller because Miller stresses making the diff files as small as possible, and adding a copy command to Balcha's system would unduly increase the size of the diff file.  *Id.* at 19–20; Hr'g Tr. 25, 33 ("if you had the Balcha and the Miller combination and you found that it was a proper combination, then the elements of the claims are there").

In light of our construction of "writing a command . . . to copy," at least Miller teaches "writing a command . . . to copy."  Specifically, regardless of the name of the command ("copy" versus "delete") used,

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

Miller discusses creating a new file and, using the diff file and the old file, "[s]trings will be copied or inserted into the new file." Ex. 1004, 15:62–63. Moreover, although Balcha is not clear regarding whether the second computer generates a new file or merely updates the old file, Petitioners' argument that there are only limited options, and electing to generate a new file (thus retaining prior versions) would have been obvious for a skilled artisan to try, is persuasive.

We find persuasive the various reasons presented by Petitioners for combining Balcha and Miller, which are both systems and methods directed to updating files on a remote computer. As pointed out by Petitioners, there were a limited number of options for executing incremental backup (or diff) files.

We have reviewed the Petition, the Patent Owner Response, and Petitioners' Reply, as well as the relevant evidence discussed in those papers. We are persuaded, by a preponderance of the evidence, that the combination of Balcha and Miller teaches each of the limitations and that Balcha and Miller is a proper combination, and therefore, that claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31 are obvious in view of the combination of Balcha and Miller under 35 U.S.C. § 103.

### H. Analysis of Whether Claims 6–8 and 17–19 Are Unpatentable Obvious Over Balcha, Miller, and Freivald Under 35 U.S.C. § 103(a)

The Board instituted trial on Petitioners' challenge of obviousness of claims 6–8, which depend from claim 5, and 17–19, which depend from claim 16, over Balcha, Miller, and Freivald. Dec. on Inst. 24–26, 30. Claims 17–19 differ from claims 6–8 only in that claims 17–19 recite

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

computer readable media rather than methods. Patent Owner argues only that claims 6–8 and 17–19 are patentable for the same reasons argued with respect to the patentability of claims 1 and 12 over Balcha and Miller, which we addressed above.

Petitioners allege that each additional limitation recited in claims 6–8 and 17–19 is taught by Freivald, provide detailed analysis and claim charts mapping the limitations of the claims to disclosures of Balcha, Miller and Freivald, and provide reasons for combining Freivald with the Balcha-Miller system. Pet. 28–31. Specifically, claims 6 and 17 recite checking whether the version of the file was altered prior to executing the steps necessary to generate the update and executing those steps only if a change is detected. Claims 7 and 18 recite "performing a check is performed at periodic intervals," and claims 8 and 19 recite performing a check is done by comparing current and earlier time stamps.

Petitioners argue a skilled artisan would have been motivated to combine Freivald with Balcha-Miller because all of the prior art references relate to sending updates to remote computers to allow the remote computer to amend files, and because incorporating Freivald's teachings related to determining whether a file has been altered is merely substituting well-known methods for those disclosed in Balcha and Miller, leading to predictable results. *Id.* at 29. Moreover, Petitioners argue there were a limited number of options "to determine when files should be updated (e.g., periodic polling, waiting to receive an update request)" and that each option would lead to a predictable and known solution. *Id.*

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

We have reviewed the Petition, the Patent Owner Response, and Petitioners' Reply, as well as the relevant evidence discussed in those papers. We are persuaded, by a preponderance of the evidence, that Balcha, Miller, and Freivald is a proper combination, that the combination teaches the subject matter of claims 6–8 and 17–19, and, therefore, that claims 6–8 and 17–19 are obvious in view of the combination of Balcha, Miller, and Freivald under 35 U.S.C. § 103.

### I.  Motion To Amend

Patent Owner moves to substitute claim 47 for claim 42, if we determine claim 42 is unpatentable. Mot. to Amend 1. Because we determine that Petitioners have demonstrated, by a preponderance of the evidence, that all challenged claims are unpatentable, including claim 42, Patent Owner's Contingent Motion to Amend is before us for consideration. Proposed substitute claim 47 is an independent claim, and is reproduced below.

> 47. A computer readable storage medium, comprising computer readable program code embodied on said computer readable storage medium, said computer readable program code for programming a first computer to provide updates for transmission to a second computer that permits the second computer to obtain most recent versions of files, the computer readable program code causing the first computer to perform the following steps:
>
> (a) determining whether the second computer has a latest version of a file, wherein said determining is performed by the first computer without interaction with the second computer by comparing representations of segments of

35

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

> the latest version of the file with representations
> of segments of an earlier version of the file in
> which ends of each of the segments of the
> earlier version of the file are defined by
> segment delimiters that are statistically
> determined to be optimal division points for the
> segments;

> (b) generating an update, if the second computer
> does not have a latest version of the file,
> wherein said generating is performed by the
> first computer without interaction with the
> second computer; and

> (c) transmitting the update from the first computer
> to the second computer.

Mot. to Amend 1–2 (emphasis added by Patent Owner to indicate changes).

A motion to amend is a motion under 37 C.F.R. § 42.20, and is subject to the requirements of that rule. The rule includes that "[t]he moving party has the burden of proof to establish that it is entitled to the requested relief." 37 C.F.R. § 42.20(c). Thus, the Patent Owner as movant bears the burden to demonstrate patentability and compliance with 37 C.F.R. § 42.221.

This burden may not be met merely by showing that the proposed claims are distinguished over the prior art references applied to the original patent claims. Instead, Patent Owner must show that the proposed substitute claims are patentable over the prior art in general. *See Idle Free Sys., Inc. v. Bergstrom, Inc.*, Case IPR2012–00027, slip op. at 33 (PTAB Jan. 7, 2014) (Paper 66). "An *inter partes* review is neither a patent examination proceeding nor a patent reexamination proceeding." *Id.* If a motion to amend is granted, the proposed substitute claims will be added directly to the

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

patent, without examination. *Id.* Petitioners cannot be relied on to fill the role of an Examiner because their interests and motivation are not necessarily aligned with that of the general public. For the reasons discussed below, Patent Owner's Motion to Amend is denied.

Patent Owner acknowledges[10] that "[t]ransmitting files between computers as a number of different segments (rather than as an entire file) has been a technique used for many decades." Mot. to Amend 12; *see also* Hr'g Tr. 34. Patent Owner further explains that, at the time of invention of the '799 Patent, files were segmented using either fixed length segments or variable length segments, and each segment was identified by delimiters. Mot. to Amend 12–13. Patent Owner also acknowledges that prior art systems, including Williams, taught methods of file synchronization using variable length segments. *Id.* at 13. Patent Owner explains that there were various ways of determining the boundaries for variable length segments, such as denoting boundaries when a certain character or set of characters was present in a file. *Id.* at 13–14. Patent Owner even acknowledges that "Williams also recognized that it may be desirable to employ different file segmenting strategies in a single application." *Id.* at 14.

Patent Owner argues that the specific method of segmentation recited in proposed claim 47 is missing in the prior art. Specifically, Patent Owner asserts the prior art did not "employ, in a method for providing updates as part of a file backup, a file segmenting method in which segments of a file

---

[10] The argument in Patent Owner's MTA under the section heading "Patentability of Proposed Claim 47" is substantively identical to the portions of Dr. Mohaptra's Declaration (Ex. 2009) cited in that section. *See* Ex. 2009 ¶¶ 38–41.

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

are defined by segment delimiters that are statistically determined to be optimal division points for the segments." *Id.* at 14 (citing Ex. 2009 ¶ 41).

Petitioners argue Patent Owner has not met its burden of establishing that it is entitled to the relief requested in the MTA because (1) Patent Owner has not shown the added limitation is patentable over the prior art of record in this proceeding, (2) Patent Owner has not shown patentability of proposed claim 47 over the prior art in general, because Patent Owner has not pointed to any art other than the references already asserted in this proceeding, and (3) the added limitation in proposed claim 47 is not enabled because the Specification of the '799 Patent fails to provide any explanation, beyond the language recited in proposed claim 47, of how the function is achieved. Opp. MTA 1–3.

We are unpersuaded by Patent Owner's arguments because Patent Owner addresses neither the level of ordinary skill in the art nor the prior art known to Patent Owner generally, with respect to a particular feature it added to original patent claims to form the proposed substitute claim. During oral argument, counsel for Patent Owner stated that he did not "know what somebody [of ordinary skill in the art] would consider or not, but it seems at least in [Petitioners' Declarant] Dr. Hutchinson's opinion," what was known in the file back-up field "would be the relevant inquiry." Hr'g Tr. 37:1–6. Patent Owner's discussion of the prior art with respect to the patentability of the added limitation was restricted to the assertions that the recited segmentation methodology was not done previously "when providing updates as part of a file backup," and that "[n]one of the *cited* references . . . teaches or suggests" the amended limitation. Mot. to Amend 14 (emphasis

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

added).  During oral argument, upon inquiry from the Board, counsel for

Patent Owner acknowledged that its assertions of patentability were limited

to the field of file back-up. Hr'g Tr. 36:19–38:12.

Although Patent Owner is not expected to know of all pre-existing

prior art, it is expected to indicate what it does know, particularly with

respect to the feature it has proposed to add to the original patent claims, i.e.,

defining segments "by segment delimiters that are statistically determined to

be optimal division points."  Instead, Patent Owner relied upon art asserted

by Petitioner, which relates to updates for file back-up.  Petitioner cannot be

expected to select the closest art for the proposed additional limitation when

Petitioner could not have predicted the limitation(s) Patent Owner would opt

to add to proposed claim amendments.  The assertion that the added

limitation was not taught was restricted to the field of file back-up in Patent

Owner's Motion to Amend and Dr. Mohaptra's Declaration.  At oral

argument, Patent Owner asserted for the first time that it was unaware of *any*

art that taught the proposed additional segmentation methodology limitation.

*See* Hr'g Tr. 36:9–11, 37:9–11.  The statement by counsel for Patent Owner

at oral argument, however, is too late to be considered because no new

argument may be presented at oral hearing.  Patent Owner's Declarant, Dr.

Mohaptra, limited his statement that the proposed limitation had not been

used to the field of file back-up and nothing in Patent Owner's submitted

papers or evidence expanded that assertion to include all relevant prior art.

*Id.* at 38:1–12.

For the foregoing reasons, Patent Owner has not met its burden of

showing the patentability of the proposed substitute claim 47 over the prior

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

art.  Due to the deficiencies in Patent Owner's Motion, we need not and do not consider the Opposition.

Accordingly, the contingent Motion to Amend is *denied*.

## III. CONCLUSION

Petitioners have demonstrated by a preponderance of the evidence that: claims 1, 12, 23, 24, 30, 31, 37, and 42 are anticipated by Williams; claims 5–10 and 16–21 are unpatentable as obvious over Williams and Miller; claims 37 and 42 are anticipated by Balcha; claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31 are unpatentable as obvious over Balcha and Miller; claims 6–8 and 17–19 are unpatentable as obvious over Balcha, Miller, and Freivald; and claims 37 and 42 are unpatentable as obvious over Balcha and Freivald.

## IV. ORDER

In consideration of the foregoing, it is:

ORDERED that claims 1, 5–10, 12, 16–21, 23, 24, 30, 31, 37, and 42 of the '799 patent are held *unpatentable*;

FURTHER ORDERED that Patent Owner's Motion to Amend is *denied*, and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the  notice and service requirements of 37 C.F.R. § 90.2.

40

IPR2013-00586
IPR2014-00306
Patent 6,738,799 B2

For Petitioner:

Michael Kiklis
Scott McKeown
Christohper Ricciuti
cpdocketkiklis@oblon.com
cpdocketmckeown@oblon.com
cpdocketricciuti@oblon.com


For Patent Owner:

Tarek Fahmi
Amy Embert
tarek.fahmi@ascendalaw.com
amy.embert@ascendalaw.com

## IX.   PROOF OF SERVICE

The undersigned hereby certifies that a true and correct copy of the

foregoing paper entitled

## APPELLANT'S BRIEF

was filed with the Clerk of the United States Court of Appeals for the Federal

Circuit via the CM/ECF SYSTEM. Counsel registered with the CM/ECF system

have been served by operation of the Court's CM/ECF SYSTEM per Fed. R. App.

P. 25 and Fed. Cir. R. 25(c) on the 4th day of September 2015.

Date: September 4, 2015

/s/ *Tarek N. Fahmi*
Tarek N. Fahmi
Attorney for Appellant

Ascenda Law Group, PC
333 W. San Carlos Street, Suite 200
San Jose, CA 95110

Tel: 866-877-4883
Email: tarek.fahmi@ascendalaw.com

## X.    CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and contains 12,369 words (exclusive of the corporate disclosure statement, table of contents, table of authorities, addendum, proof of service, and this certification).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).

The brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Mac ver. 15.13.1 in 14-point Adobe Garamond Pro font.

Respectfully submitted,

Date: September 4, 2015                   */s/Tarek N. Fahmi*
                                          Tarek N. Fahmi
                                          Attorney for Appellant

Ascenda Law Group, PC
333 W. San Carlos Street, Suite 200
San Jose, CA 95110

Tel: 866-877-4883
Email: tarek.fahmi@ascendalaw.com