**2015-1799**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

CLOUDING CORP.,

*Appellant*,

v.

UNIFIED PATENTS, INC.,

*Appellee*.

**Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2013-00586 and IPR2014-00306.**

## BRIEF OF APPELLEE UNIFIED PATENTS, INC.

*Of Counsel*
Jonathan Stroud
Unified Patents Inc.
1875 Connecticut Avenue, NW
Floor 10
Washington, DC 20009
(202) 805-8931

James R. Barney
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000

Daniel C. Cooley
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston VA 20190
(571) 203-2778

December 18, 2015

*Attorneys for Appellee
Unified Patents Inc.*

## CERTIFICATE OF INTEREST

Counsel for appellee Unified Patents Inc. certifies the following:

1. The full name of every party or amicus represented by me is:

   Unified Patents Inc.


2. The name of the real party in interest represented by me is:

   Unified Patents Inc.


3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

   Unified Patents Inc.


4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:


   FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
   James R. Barney
   Daniel C. Cooley

   OBLON, LLP
   Michael Kiklis
   Scott A. McKeown
   Christopher Ricciuti

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ......................................................................v

STATEMENT OF RELATED CASES ...................................................... vii

STATEMENT OF JURISDICTION..........................................................1

I.    STATEMENT OF THE ISSUES ....................................................2

II.   STATEMENT OF THE CASE ......................................................3

III.  STATEMENT OF FACTS ............................................................5

    A.    Synchronizing Files Was Known Many Years Prior to the Filing of the '799 Patent ........................................................5

        1.    *Balcha* ...........................................................................7

        2.    *Miller* ............................................................................9

        3.    *Williams* .....................................................................10

        4.    *Freivald* .....................................................................12

    B.    The '799 Patent .......................................................................12

    C.    Unified Filed a Petition Seeking *Inter Partes* Review of the '799 Patent.......................................................................14

        1.    Clouding Filed a Preliminary Response Arguing that the Prior Art Lacks "Writing a Command . . . to Copy" and "Determining Whether the Second Computer Has a Latest Version of a File"................................15

        2.    The Board Instituted *Inter Partes* Review on All of the Challenged Claims ............................................17

        3.    Clouding Filed a Patent Owner's Response and Motion to Amend ...................................................18

4.      The Board Held All of the Instituted Claims
Unpatentable in Its Final Written Decision and Denied
Clouding's Motion to Amend ...................................................22

IV.    SUMMARY OF ARGUMENT.....................................................23

V.     ARGUMENT...............................................................................25

A.    Standard of Review ..........................................................25

B.    Clouding Does Not Challenge the Board's Claim
Constructions and Cannot Do So in Its Reply .....................25

C.    The Board Correctly Concluded that Claims 1, 5–10, 12,
16–21, 23, 24, 30, and 31 Are Unpatentable, Finding that the
Prior Art Provides "Writing a Command . . . to Copy" ......28

1.      *Williams* Discloses "Writing a Command . . . to
Copy" .........................................................................29

2.      *Williams* Combined with *Miller* Renders Obvious
"Writing a Command . . . to Copy" ...........................32

3.      An Ordinarily Skilled Artisan Would Have Found It
Obvious to Combine *Miller*'s "Command . . . to
Copy" with *Balcha*...................................................34

4.      "Writing a Command . . . to Copy" Also Would Have
Been Obvious in View of the Combination of *Miller*,
*Balcha*, and *Freivald*...............................................36

D.    The Board Correctly Concluded that Claims 37 and 42 Are
Unpatentable, Rejecting Clouding's Argument that the Prior
Art Lacks "Determining Whether the Second Computer Has
a Latest Version of a File"....................................................37

1.      *Williams* Discloses "Determining Whether the Second
Computer Has a Latest Version of a File"................37

2.      *Balcha* Discloses "Determining Whether the Second
Computer Has a Latest Version of a File"................40

3.    *Balcha* and *Freivald* Also Render Obvious
        "Determining Whether the Second Computer Has a
        Latest Version of a File" ............................................................44

E.    The Board Correctly Denied Clouding's Motion to Amend
      Because Clouding Failed to Carry Its Burden to Establish
      the Patentability of Its Proposed Substitute Claim.............................45

VI.   CONCLUSION..............................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*,
  287 F.3d 1108 (Fed. Cir. 2002) ........................................................30

*Hewlett-Packard Co. v. Mustek Systems, Inc.*,
  340 F.3d 1314 (Fed. Cir. 2003) ........................................................43

*Idle Free Systems, Inc. v. Bergstrom, Inc.*,
  IPR2012-00027, 2014 WL 824156 (PTAB Jan. 7, 2014) ..................47

*Idle Free Systems, Inc. v. Bergstrom, Inc.*,
  IPR2012-00027, Paper 26 (PTAB June 11, 2013) ......................45, 46

*In re Cuozzo Speed Technologies, LLC*,
  793 F.3d 1268 (Fed. Cir. 2015) ........................................................25

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ........................................................25

*In re Gleave*,
  560 F.3d 1331 (Fed. Cir. 2009) ........................................................25

*In re Kotzab*,
  217 F.3d 1365 (Fed. Cir. 2000) ........................................................25

*In re Mettke*,
  570 F.3d 1356 (Fed. Cir. 2009) ........................................................25

*In re Suitco Surface, Inc.*,
  603 F.3d 1255 (Fed. Cir. 2010) ........................................................26

*KSR International Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)............................................................32, 33, 35

*MasterImage 3D, Inc. v. RealD Inc.*,
  IPR2015-00040, 2015 WL 4383224 (PTAB July 15, 2015)............45

*Microsoft Corp. v. Proxyconn, Inc.*,
  789 F.3d 1292 (Fed. Cir. 2015) ....................................25, 26, 45, 47

*Novosteel SA v. United States*,
284 F.3d 1261 (Fed. Cir. 2002) .........................................................................26

*Perfect Web Technologies, Inc. v. InfoUSA, Inc.*,
587 F.3d 1324 (Fed. Cir. 2009) .........................................................................35

*Prolitec, Inc. v. Scentair Technologies, Inc.*,
No. 2015-1020, 2015 WL 7873637 (Fed. Cir. Dec. 4, 2015) ...........................46

*Seachange International, Inc. v. C-COR, Inc.*,
413 F.3d 1361 (Fed. Cir. 2005) .........................................................................43

*Unified Patents, Inc. v. Clouding IP, LLC*,
IPR2013-00586, Paper 16 (PTAB May 8, 2014) ..............................................45

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ........................................................................................1

35 U.S.C. § 141(c) ....................................................................................................1

**Regulations**

37 C.F.R. § 42.20(c) ..........................................................................................45, 46

**Other Authorities**

H.R. Rep. No. 112-98, pt. 1 (2011), *as reprinted in* 2011
U.S.C.C.A.N. 67 ...............................................................................................47

## STATEMENT OF RELATED CASES

There has been no other appeal from the present case in this or any other appellate court.

U.S. Patent No. 6,738,799 ("the '799 patent") is at issue in *Clouding Corp. v. EMC Corporation, et al.*, No. 1:14-cv-01178 (D. Del).

## STATEMENT OF JURISDICTION

This is an appeal of a Final Written Decision of the United States Patent and Trademark Office ("PTO") Patent Trial and Appeal Board ("Board") in IPR2013-00586 and IPR2014-00306, finding claims 1, 5–10, 12, 16–21, 23, 24, 30, 31, 37, and 42 of the '799 patent unpatentable. This Court has jurisdiction over this appeal under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## I.    STATEMENT OF THE ISSUES

A. Does substantial evidence support the Board's factual finding that U.S. Patent No. 5,990,810 to Williams ("*Williams*") discloses "writing a command . . . to copy" when both parties' experts interpret *Williams* as disclosing instructions to copy?

B. Would it have been obvious for an ordinarily skilled artisan to combine a command to copy as disclosed by U.S. Patent No. 5,832,520 to Miller ("*Miller*") with the file-synchronization teachings of U.S. Patent No. 6,233,589 to Balcha et al. ("*Balcha*") or *Williams* when each of these references relates to the same general technology and a command to copy was part of two well-known alternatives for duplicating data?

C. Does substantial evidence support the Board's factual finding that *Williams*, *Balcha*, and U.S. Patent No. 5,898,836 to Freivald et al. ("*Freivald*") each disclose "determining whether the second computer has a latest version of a file"?

D. Did Clouding Corp. ("Clouding") satisfy its burden for a motion to amend when, contrary to instructions from the Board, it failed to address prior art outside of the proceeding, limited its analysis to the context of "file backup," and did not explain why its amended claim was nonobvious?

## II.    STATEMENT OF THE CASE

Upon petition by Unified Patents Inc. ("Unified"), the Board instituted *inter partes* review of claims 1, 5–10, 12, 16–21, 23, 24, and 30 of the '799 patent on various anticipation and obviousness grounds—ultimately finding every challenged claim unpatentable. Clouding attempts to distinguish the challenged claims from the prior art on the basis of two claim limitations. For claims 1, 5–10, 12, 16–21, 23, 24, 30, and 31, Clouding argues that the prior art fails to disclose or would not have been combined with "writing a command . . . to copy." For claims 37 and 42, Clouding contends that the prior art fails to disclose "determining whether the second computer has a latest version of a file." Clouding does not challenge the claim construction for either claim limitation.

Regarding a "command . . . to copy," Clouding's own expert conceded that *Williams* discloses this. A1346–50. The Board reached the same conclusion. Addressing obviousness grounds involving *Miller*, Clouding admitted that "Miller teaches a command to copy. There's no dispute about that." A458:4–5. Clouding also admitted that there are only two options for implementing a synchronization system, one involving a command to copy (a discard-by-default scheme) and one using a command to delete (a retain-by-default scheme). Notwithstanding this limited set of well-known alternatives, Clouding contends that an ordinarily skilled artisan would not have combined *Miller*'s copy command with *Williams* and

3

*Balcha* because it would defeat *Miller*'s objective of producing the smallest possible update file. However, *Miller* uses a command to copy *for the very purpose* of producing the smallest possible update file. According to the Board, "Miller's stated objective for its own invention cannot be read to eliminate a key element of its invention that is used for achieving the very same objective." A233–34.

The Board instituted review of claims 37 and 42 twice for anticipation and once for obviousness. Clouding's Preliminary Response and Patent Owner's Response—like its appeal brief—contended that the prior art does not disclose "determining whether the second computer has a latest version of a file." The Board's Final Written Decision rejected this as imposing an "absolute certainty" requirement to the "determining" limitation that is incorrect as a matter of claim construction and application of that claim construction. Indeed, the "absolute certainty" requirement creates a standard that the '799 patent itself cannot meet. Using the correct claim construction of the "determining" limitation, the Board found that *Williams*, *Balcha* and *Freivald* each separately disclose "determining whether the second computer has a latest version of a file," and those findings are supported by substantial evidence.

The Board also denied Clouding's Motion to Amend. Early in the proceeding, the Board counseled Clouding to confirm that it was "unaware of any prior art which includes all of the features in the proposed substitute claim." A267.

The Board also counseled Clouding to address whether the proposed claim was nonobvious. *Id.* Notwithstanding this guidance, Clouding limited its assertions of patentability to the field of "file backup" and prior art from "this proceeding," and did not explain why combining the amended feature with the other claim elements would have been nonobvious. A336–39. The Board found that Clouding had failed to carry its burden for its Motion to Amend.

After the Board issued its Final Written Decision, which held every challenged claim unpatentable on at least two separate grounds, *see* A21–40, Clouding filed the instant appeal.

## III. STATEMENT OF FACTS

### A. Synchronizing Files Was Known Many Years Prior to the Filing of the '799 Patent

File-synchronization systems were known decades before the filing of the '799 patent. A882–86. Such systems were capable of synchronizing (or backing up) a file created on a first computer with a duplicate of the file on a second computer. A883–84; A776, 1:10–47. Because only small portions of files may change from version to version, the prior art disclosed a differencing process to synchronize only the differences between two files. A883–84; A776, 1:29–40.

A common prior-art method for identifying differences between file versions involved splitting a file into a series of segments and determining unique identifiers for the segments called "signatures," "hash[es]," or "checksums."

5

A883–84; A895. A mismatch of a signature or checksum for a file segment would indicate that the file segment had changed. A884. Using file signatures, computers could determine if segments of different file versions were synchronized. *Id*.

Creating an "update," "difference," or "delta" file was another well-known technology prior to the '799 patent. An update file included data and commands needed to synchronize one file with another file. A884–85. For example, a first computer in a synchronization system may determine that a file had been modified, thereby necessitating synchronization with a duplicate file located on a second computer. A883–84. The first computer could create an update file with the new file segments and a series of commands—such as copy and insert commands— instructing the second computer how to create the new file. A884. When a file segment was unchanged, a copy command would be used to instruct the second computer to copy that file segment from the old file saved on the second computer. *Id*. When a segment had changed, an insert command would be used to instruct the second computer to insert the new file segment from the update file. *Id*. The process of using copy and insert commands to duplicate a file was called a retain-by-default process. A888–92. The prior art also disclosed a discard-by-default process, which used insert and delete commands to duplicate a file. *Id*.

Once the first computer had created the update file, it would send the update file to the second computer, and the second computer would use the new data and

6

instructions to synchronize the old version of the file with the new version of the file. *Id.* The prior art explained that this process required less network bandwidth because an update file is typically smaller than the synchronized file itself. A883.

By the time the '799 patent was filed in 1999, differencing techniques, file signatures, and update files had been repeatedly disclosed in references like *Balcha*, *Miller*, and *Williams*.

### 1.    *Balcha*

*Balcha* describes a mechanism for synchronizing files on two different computers using an update or "delta" file. A771, Abstract. *Balcha* discloses a first server 22 and a second server 24 each storing a copy of a base file, identified as base file 21 and base file 27, respectively. A772, Fig. 1; A777, 4:48–54. Servers 22 and 24 also include a copy of a base signature file, identified as file 20 and file 28, respectively. A777, 4:59–60; A772, Fig. 1 (reproduced and annotated below).



FIG. 1

Initially, base files 21, 27 are identical. A777, 4:54–56. *Balcha* explains that at a later point in time, base file 21 may be updated. A777, 4:60–61. Server 22 may detect the change, and using signature file 20, create a delta file reflecting the differences between the original base file 21 and the revised base file 21. A777, 4:61–66. Server 22 then sends the delta file over the network to server 24, which uses the delta file in combination with its now outdated copy of the base file (i.e., base file 27) to construct a copy of the up-to-date base file (i.e., base file 21), thereby resynchronizing base file 21 and base file 27. A777, 4:66–67.

The reconstruction process is guided by "primitives" found in the delta file, which are commands to insert, modify, and delete data. A778, 6:64–A779, 7:2; A897–99. Server 24 applies these primitives (e.g., insert and delete commands) to combine unchanged data from the old version of the base file (i.e., base file 27) with new data included in the delta file, thereby constructing a file that mirrors the revised file (i.e., base file 21). A777, 3:54–58; A778, 6:64–A779, 7:2; A897–98.

### 2.    *Miller*

Like *Balcha*, *Miller* discloses a system and a method for generating and transmitting an update or difference file (also called a "DIFF" file) between two computers. *Miller* depicts a computer 1 using a differencing process 100 to identify the differences between an old file 10 and a new file 20. *See* A786, Fig. 1 (reproduced and annotated on the right); A785, Abstract; A801, 5:17–21. The differencing process 100 creates and transmits a difference file 30 across a communication path 5 to a computer 2. A801, 5:17–39. Computer 2 uses the difference file 30 and the second computer's copy of the old version of the file 15 in a revision process 200 in order to create new file 25 (which, after the revision process, mirrors new file 20). A786, Fig. 1; A801, 5:35–41.

During revision process 200, *Miller* uses a copy command to copy data from the old duplicate file 15 and an insert command to insert new data to create new

9

file 25. *See, e.g.*, A800, 3:24–25; A801, 5:26–30; A788, Fig. 3; A791, Fig. 5A. *Miller* includes a copy command in the difference file (rather than insert commands alone) because it minimizes the size of the difference file. A799, 2:21–24; A800, 3:18–21. In particular, *Miller* states that a copy command reduces the size of the difference file because "[c]opying data from the old file requires only a command code, whereas inserting data requires a command, plus the actual insertion data." A800, 3:26–29.

### 3.    *Williams*

*Williams* describes a technique for backing up files between two computers. A869, 19:29–34. *Williams*'s system detects changes between segments of old and new files using hashes (file signatures). A869, 19:45–52; A912. The system then creates an update file (D), containing raw data for new or modified segments along with copy and insert commands. *See* A858, Fig. 25; A912.

As depicted in Figure 25 of *Williams*, reproduced below, the system sends the update file (D) from a first entity/computer (E1), which has the current version of the file (X), to a second entity/computer (E2), which has the old/backup version of the file (Y). A858, Fig. 25. The system uses the update file (D) and the old version of the file (Y) located on the second computer (E2) to reconstruct the current version of the file (X), thereby backing up the current version of the file (X) to the second computer (E2). *Id.*



*Williams*'s Figure 25 discloses an example of an update file (D) with seven copy and insert commands. A912–15; A858, Fig. 25. The relevant portions of Figure 25 along with the seven commands disclosed by (D) are provided below.



(Y)                    (D)                    (X)

    a.  Insert a new segment which did not appear in file Y

    b.  Copy segment 1 from file Y

    c.  Insert a new segment which did not appear in file Y

    d.  Copy segment 6 from file Y

    e.  Insert a new segment which did not appear in file Y

    f.  Copy segment 2 from file Y

g.  Insert the same new segment that was inserted in step (a) above.

A914–15.

*Williams* explains that its backup system helps make data communication more efficient by reducing the transmission of redundant data already stored on the backup computer. A860, 1:7–10, 1:35–40. When a file has been updated on the backup computer (E2), *Williams* discloses retaining prior versions of the backup files. A870, 21:62–66.

### 4.     *Freivald*

Similar to file-synchronization technology, *Freivald* discloses a device for change-detection. A811, Abstract. In particular, *Freivald* describes a change-detection web server that automatically checks webpages or portions of webpages for changes and notifies users when changes occur. *Id.*; A825, 7:3–15. The service notifies users of the changes by sending an email. A825, 7:18–44.

### B.     The '799 Patent

A half-decade or more after *Balcha*, *Miller*, and *Williams* filed patent applications for their file-synchronization technologies, the application leading to the '799 patent was filed with the PTO. A47. The '799 patent discloses a method for synchronizing a local copy of a file stored on a client computer 201 with an updated version of the file stored on a network drive 202 connected to a server 203. A47, Abstract; A50, Fig. 2; A61, 1:24–27; A64, 7:50–56.



After client computer 201 subscribes to a file located on network drive 202, server 203 periodically monitors the subscription file, and if it detects a change in the subscription file at a future time, server 203 generates an update file for transmission to client computer 201 to synchronize the file. A47; A50, Fig. 2; A62, 3:41–44; A64, 7:50–60. According to the '799 patent, "[t]he update file is only generated when the server computer determines that the subscription file has changed." A62, 4:32–34.

To generate the update file, the '799 patent compares the old subscription file with the changed subscription file using file signatures. A47, Abstract. When the comparison indicates that a segment of the changed file matches a segment of the old file, the system retains the old segment by "writ[ing] a command in the update file for the client to copy [the] old segment of the client's copy of the earlier version of the subscription file into the client's copy of the current version of the

13

subscription file." *Id.* When the segment of the new file does *not* match a segment of the old file, indicating that the segment of the changed file has changed relative to the old file, the system includes in the update file the new segment of the file and a command to "insert [the] new segment of the current version of the subscription file into the client's copy of the current version of the subscription file." *Id.* The '799 patent discloses using email to send the update file. A62, 3:41–44. The system can send the update file to the client computer and use the update file and the earlier version of the subscription file to re-create the new version of the subscription file on the client computer. *See, e.g.*, A65, 10:23–65.

### C.    Unified Filed a Petition Seeking *Inter Partes* Review of the '799 Patent

Unified filed a petition for *inter partes* review of claims 1, 5–10, 12, 16–21, 23, 24, 30, 31, 37, and 42 of the '799 patent raising six different grounds:

1.  *Williams* anticipating claims 1, 12, 23, 24, 30, 31, 37, and 42;

2.  *Williams* and *Miller* rendering obvious claims 5–10 and 16–21;

3.  *Balcha* anticipating claims 37 and 42;

4.  *Balcha* and *Miller* rendering obvious claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31;

5.  *Balcha*, *Miller*, and *Freivald* rendering obvious claims 6–8 and 17–19; and

6. *Balcha* and *Freivald* rendering obvious claims 1, 12, 23, 30, 37, and 42.

A83.

The petition challenged each claim on at least two separate grounds and explained how *Balcha*, *Williams*, *Miller*, and *Freivald*—none of which considered during prosecution—demonstrated that "delta file synchronization and document push techniques were well known to a person of ordinary skill in the art well before the earliest claimed priority date of the '799 patent." A78–79. The petition addressed every element of the claims, including "writing a command . . . to copy" from claims 1, 5–10, 12, 16–21, 23, 24, and 30, and "determining whether the second computer has a latest version of a file" from claims 37 and 42. *See* A92–133.

> **1.    Clouding Filed a Preliminary Response Arguing that the Prior Art Lacks "Writing a Command . . . to Copy" and "Determining Whether the Second Computer Has a Latest Version of a File"**

Clouding filed a preliminary response arguing that the grounds in the petition did not render the '799 patent unpatentable because the prior art did not disclose or would not have been modified to include "writing a command . . . to copy" or "determining whether the second computer has a latest version of a file."

Addressing whether *Williams* anticipated claims 1, 12, 23, 24, 30, and 31, Clouding argued that *Williams* lacked the claimed "command . . . to copy" because

*Williams* modified the old version of a backup file (Y) directly (i.e., it overwrote the file) rather than "copying" segments from the old version of the backup file (Y) to a new version of the backup file (Y). A194.

Turning to the *Balcha* and *Miller* obviousness combination, Clouding did not dispute that *Balcha* and *Miller* together taught all of the claim features, conceding that *Miller* "teach[es] the inclusion of a copy command in a DIFF file." A184. Instead, Clouding argued that an ordinarily skilled artisan would not have combined *Miller* with *Balcha* because *Miller*'s goal was to produce the smallest possible DIFF or update file, and including *Miller*'s copy command in an update file (such as the update file in *Balcha*) would increase the size of the update file, thereby defeating *Miller*'s objective. A184–85. Clouding argued that an ordinarily skilled artisan would have "adopt[ed] the *Balcha* approach" and "eliminate[d] the need for a copy command." A184. Clouding repeated a similar argument for the combination of *Balcha*, *Miller*, and *Freivald*, A186–88, and the combination of *Williams* and *Miller*, A197–200.

For claims 37 and 42, Clouding argued that *Williams* does not determine whether the second computer has a "latest version of [the] file." According to Clouding, prior to initiating a backup procedure, *Williams*'s first computer (E1) only determines whether a second computer (E2) stores a different, not necessarily the "latest," version of a file. A200–01. Clouding made a similar argument

16

regarding *Balcha*, contending that it "only discloses detecting whether a base file has been modified, regardless of when that modification may have occurred relative to other copies of the same base file." A172. Clouding repeated this argument for the combination of *Balcha* and *Freivald*. A190–91.

## 2. The Board Instituted *Inter Partes* Review on All of the Challenged Claims

On March 21, 2014, the Board issued an Institution Decision finding "a reasonable likelihood that [Unified] would prevail in demonstrating unpatentability" for every claim that it challenged (i.e., claims 1, 5–10, 12, 16–21, 23, 24, 30, 37, and 42). A238–39.

The Board rejected Clouding's argument that *Williams* fails to disclose a "command . . . to copy" limitation, noting the argument was "based on Clouding's proposed narrow claim construction."[1] A226–27. According to the Board, "Clouding fails to recognize that, as explained in Williams, the subblocks of file Y are *duplicated* in computer E2, and that is caused by the instructions in the incremental backup file D." A227.

Turning to the *Balcha* and *Miller* combination, the Board dismissed Clouding's contention that an ordinarily skilled artisan would not have combined

---

[1] The Board's decision construed the phrase "command . . . to copy" as "*an instruction that causes the computer to duplicate information or data,*" A219–20; A227, rejecting Clouding's proposed construction that "a command to copy be written in the update," A219-20.

*Miller*'s copy command with *Balcha* due to *Miller*'s teaching to keep the DIFF file (i.e., update file) as small as possible. A233–34. The Board stated that Clouding had taken *Miller*'s objective "out of context," A233, and "Miller's stated objective for its own invention cannot be read to eliminate a key element of its invention that is used for achieving the very same objective," A233–34.

Addressing whether *Williams* anticipates claims 37 and 42 and discloses "determining whether the second computer has a latest version of a file," the Board noted that "Williams discusses initiating a backup action only when the original file has changed." A228. The Board was "not persuaded" by Clouding's argument that *Balcha* failed to disclose the "determining" limitation, noting that Clouding's arguments were "based on narrow interpretations of the disputed claim phrases," which the Board declined to adopt. A232. According to the Board, "Balcha's detecting server determines whether a monitored file has been revised," which, "[f]rom the point of view of the computer generating the delta file," means "the system has determined that the base file is not 'a latest version' of the file." *Id.*

### 3.    Clouding Filed a Patent Owner's Response and Motion to Amend

Clouding filed a Patent Owner's Response reasserting arguments from its Preliminary Response. For example, for the "command . . . to copy" limitation, Clouding reargued that *Williams* overwrites the old file instead of using a "copy" command. A308–09. Clouding also contended that the combination of *Balcha* and

*Miller* was improper because "*Miller's* goal is to produce a smallest possible DIFF file." A316.

Regarding *Williams*'s anticipation of claims 37 and 42, Clouding maintained that *Williams* only "accommodate[s] situations in which computer E2 may store a different, but not necessarily a latest, version of a file than computer E1." A318. For *Balcha*, Clouding reasserted that "*Balcha* only discloses detecting a modification to the file without regard to whether the modified file is, indeed, the latest version of the file." A287.

Clouding also sought to file a Motion to Amend. Clouding had previously initiated a conference call with the Board, seeking guidance on "how . . . [to] make out a prima facie case that it is entitled to a proposed substitute claim, not considering any opposition by the Petitioner." A267. In response, the Board explained that "the burden is on the Patent Owner to establish patentability of the proposed substitute claim." A268. The Board counseled Clouding to "state, but only if true, that Patent Owner is unaware of any prior art which includes all of the features in the proposed substitute claim." A267. The Board explained that prior-art information about the amended features is "relevant to our review of the proposed substitute claim(s)," and "[i]f Patent Owner is not forth coming [sic] with . . . information [about the amended feature], we would notice the deficiency." A268.

The Board also counseled Clouding to address obviousness, "with special focus on the feature(s) added relative to an original patent claim being replaced by the proposed substitute claim." A267. "If invention having features A-Y is unpatentable based on the prior art asserted by the Petitioner, and if Patent Owner presents a proposed substitute claim which adds feature Z to arrive at an invention including features A-Z," then Clouding may wish to "explain[] why one with ordinary skill in the art would not have reason to combine feature Z from those scenarios with features A-Y to form an invention including features A-Z." A268.

After receiving this guidance, Clouding filed its Motion to Amend seeking to add substitute claim 47 with an amended feature relating to "segment delimiters that are statistically determined to be optimal division points for the segments." A325–26.

> 47. (Proposed Substitute for Original Claim 42) A computer readable storage medium, comprising computer readable program code embodied on said computer readable storage medium, said computer readable program code for programming a first computer to provide updates for transmission to a second computer that permits the second computer to obtain most recent versions of files, the computer readable program code causing the first computer to perform the following steps:
>
> (a) determining whether the second computer has a latest version of a file, wherein said determining is performed by the first computer without interaction with the second computer by comparing representations of segments of the latest version of the file with representations of segments of an earlier version of the file in which ends of

<u>each of the segments of the earlier version of the file are</u> <u>defined by segment delimiters that are statistically</u> <u>determined to be optimal division points for the</u> <u>segments</u>;

(b) generating an update, if the second computer does not have a latest version of the file, wherein said generating is performed by the first computer without interaction with the second computer; and

(c) transmitting the update from the first computer to the second computer.

*Id.* (amended text underlined).

Clouding's motion asserted claim 47 was patentable relative to "references at issue in this proceeding" and methods used "as part of a file backup." A338–39. Clouding conceded that transmitting files between computers using "segments (rather than as an entire file)" was "a technique used for many decades," and "many different methods have been employed as means of segmenting files." A336. Clouding also conceded that optimization of segment sizes was known, stating that "optimum segment sizes were usually determined on the basis of available bandwidth on a network link, or enabling rapid comparisons of segments." A338. Notwithstanding these concessions, Clouding contended that "employ[ing] . . . a file segmenting method in which segments of a file are defined by segment delimiters that are statistically determined to be optimal division points for the segments" had not been done prior to the invention—"as part of a file backup." *Id.*

21

4.    **The Board Held All of the Instituted Claims Unpatentable in Its Final Written Decision and Denied Clouding's Motion to Amend**

In its Final Written Decision, the Board found all instituted claims unpatentable. A40. Regarding anticipation of claims 1, 12, 23, 24, and 30 by *Williams*, the Board again rejected Clouding's argument that *Williams* does not use a copy command and instead overwrites the old file. A22–23. The Board noted that "Y and X are separately co-existing files at the second computer." A24. The Board also noted that *Williams* discloses retaining copies of previous versions of files, which "supports the finding that Williams's second computer, E2, does duplicate data or information as a result of the commands Williams's first computer, E1, inserted into the incremental backup file, D, meeting the recited 'writing a command . . . to copy.'" A24–25.

The Board turned to the combination of *Balcha* and *Miller* and found that it rendered claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31 unpatentable. A31–33. The Board concluded that it would have been obvious to an ordinary skilled artisan to combine *Balcha* and *Miller* given that both are "systems and methods directed to updating files on a remote computer," and given the "limited number of options for executing incremental backup (or diff) files." A33.

Regarding claims 37 and 42 and the limitation "determining whether the second computer has a latest version of a file," the Board found that "Williams

discloses determining whether a file needs to be updated before executing the backup procedure and further discloses using time stamps to determine whether the second computer has the current version." A26. Clouding's contention that computer E1 of *Williams* "cannot be certain whether or not computer E2 stores a latest version of the subject file," the Board considered a misapplication of its claim construction. *Id.* (citation omitted). The "latest version of the file" is the latest version of the file "accessible by the first computer," not some later version of the file created under unanticipated circumstances. A13–14. The Board rejected a similar argument relating to the combination of *Balcha* and *Freivald*. A29–30.

Finally, the Board denied Clouding's Motion to Amend, concluding that Clouding had not met its burden of showing the patentability of the proposed substitute claim 47 over the prior art. A38–40. The Board noted that Clouding had limited its assertions of patentability to the context of "file backup," a point that Clouding confirmed at oral argument. A38–39. Clouding had also limited its analysis to prior art cited by the Petitioner, which the Board ruled was improper. A39. Clouding appealed the Final Written Decision.

## IV.   SUMMARY OF ARGUMENT

Each claim at issue is unpatentable for at least two independent reasons. Clouding advances a host of factual arguments, but in each instance, the Board's factual findings are supported by substantial evidence. For example, the Board's

finding that *Williams* discloses "writing a command . . . to copy" finds support in the written description, the drawings, and expert testimony, including Clouding's own expert. The fact that *Miller*'s command to copy can also be combined in an obvious and predictable manner with either *Williams* or *Balcha* further confirms the unpatentability of claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31.

Substantial evidence also supports the Board's factual finding that *Williams*, *Balcha*, and *Freivald* each disclose "determining whether the second computer has a latest version of a file," rendering unpatentable claims 37 and 42. Clouding attacks the Board's factual finding by misapplying the Board's construction to require absolute certainty, but this argument fails both as a matter of claim construction and application of that claim construction. Indeed, the '799 patent system itself cannot satisfy Clouding's absolute certainty requirement, and it "determines" the latest version of the file using the same method as the prior art.

Finally, Clouding contends that the Board erred by denying its Motion to Amend. However, Clouding failed to satisfy its burden for such a motion. Contrary to guidance solicited and received from the Board, Clouding failed to address prior art beyond the *inter partes* review proceeding, limited its analysis to the context of "file backup," and did not explain why its amended claim was nonobvious. For these reasons, the Board's Final Written Decision should be affirmed.

## V.    ARGUMENT

### A.    Standard of Review

The Court reviews the Board's conclusions of law without deference and its findings of fact for substantial evidence. *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1297 (Fed. Cir. 2015). "[A]nticipation is a question of fact, including whether an element is inherent in the prior art." *In re Gleave*, 560 F.3d 1331, 1334–35 (Fed. Cir. 2009). Obviousness is a legal conclusion based on underlying findings of fact. *In re Mettke*, 570 F.3d 1356, 1358 (Fed. Cir. 2009). The Board's ultimate determination of obviousness is reviewed without deference, *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000), but underlying factual findings are reviewed for substantial evidence, *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).

### B.    Clouding Does Not Challenge the Board's Claim Constructions and Cannot Do So in Its Reply

Clouding's opening brief does not challenge the Board's constructions of "writing a command . . . to copy" and "determining whether the second computer has a latest version of a file." None of Clouding's "Issues Presented" address claim construction, Br. 2–3, and nowhere does Clouding propose alternative constructions or demonstrate how such constructions are the broadest reasonable interpretation consistent with the specification and in light of the prosecution history. *See In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1276 (Fed. Cir.

2015); *Proxyconn*, 789 F.3d at 1298 ("'[C]laims should always be read in light of the specification and teachings in the underlying patent.' The PTO should also consult the patent's prosecution history in proceedings in which the patent has been brought back to the agency for a second review." (quoting *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010))).

Clouding states the standard of review for claim construction, Br. 28, and argues that the Board misapplied its construction of "determining . . . a latest version of a file," Br. 25, 36–37, 42–43, but by challenging only the *application* of the construction, Clouding concedes that the construction itself was correct. For at least these reasons, Clouding has waived the issue of claim construction. *See Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002). And Clouding cannot raise the issue on reply. *Id.* ("[R]eply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.").

Even assuming that Clouding has not waived its opportunity to challenge the Board's constructions—which it has—the Board's constructions are correct. For example, the Board's construction of "writing a command . . . to copy"[2] is

---

[2] "[I]nserting an instruction into the update that causes the second computer to duplicate information or data from an earlier version of a file into a current version of a file." A8.

consistent with the ordinary meaning of the words "command" and "copy," A1078, and also with the specification, A1078–80. Indeed, when Clouding's expert was shown the Board's construction for a command to copy, he agreed with it. A1314: 11–16.

Regarding "determining whether the second computer has a latest version of a file," the Board's analysis[3] is consistent with the specification, which discloses the first computer determining whether a file has been modified and generating an update file to synchronize the changes. *See, e.g.*, A47, Abstract ("The server periodically monitors the subscription file to determine if it has been altered before generating an update file."); A62, 4:32–39 ("The update file is only generated when the server computer determines that the subscription file has changed. . . . The user determines the periodicity of the checks to determine if the file has been altered . . . .").

The Board explicitly rejected Clouding's argument that the "latest version of a file" referenced in the claim language is the *absolute* latest version. A9–14. Rather, it is the latest version of the file "accessible by the first computer," A13–

---

[3] "Considering all of the above, an ordinarily skilled artisan would have understood the plain and ordinary meaning of the 'determining limitation' to be determining, by the first computer using known techniques based on information it has access to and without interaction with the second computer, whether the last version of the subject file sent to the second computer is not the same as the current version of the subject file." A14.

14, which makes sense because the "determining" step is performed by the first computer "without interaction with the second computer." *See, e.g.*, A69, 18:32–35.

One might be able to invent situations for the '799 patent where a "later" version of a file exists on the second computer and the first computer cannot determine it (e.g., as a result of tampering, network latencies, or other uncertainties), A11–12, but such situations are not what an ordinarily skilled artisan understood and contemplated by "determining whether the second computer has a latest version of a file." The '799 patent does not disclose such situations or how it would resolve them. Therefore, the Board's construction is correct and Clouding's "absolute certainty" requirement should be rejected.

**C.    The Board Correctly Concluded that Claims 1, 5–10, 12, 16–21, 23, 24, 30, and 31 Are Unpatentable, Finding that the Prior Art Provides "Writing a Command . . . to Copy"**

The Board found claims 1, 5–10, 12, 16–21, 23, 24, 30, and 31 unpatentable on multiple grounds. In response to all of the grounds, Clouding advances only a single argument: that the prior art fails to disclose or would not have been modified to include a "command . . . to copy." The Board rejected this argument in its Institution Decision and again in its Final Written Decision. The Court should reject the argument now.

### 1.    *Williams* Discloses "Writing a Command . . . to Copy"

There is substantial evidence supporting the Board's conclusion that *Williams* anticipates claims 1, 12, 23, 24, 30, 31, and 37 and discloses "writing a command . . . to copy." The specification discloses an update file including commands to duplicate data from an old file "Y" into a new version of the file "X" or "X . . . reconstructed." *See* A869, 20:2–5. Additional evidence is provided by *Williams*'s Figure 25, which includes instructions to copy segment 1 from file Y, copy segment 6 from file Y, and copy segment 2 from file Y. A914–15.

Clouding's expert also conceded that *Williams* discloses commands to copy:

> Q. And figure 25 describes Williams' method, at least one method, for updating . . . a file contained on the client to make it a current version; correct?
>
> A. Yes.
>
> . . .
>
> Q. And we have Y, which is a previous version of a file.
>
> A. Yes.
>
> Q. And the delta file is being applied to Y to create X; is that correct?
>
> A. Yes.
>
> . . .
>
> Q. Now, in this example that I've described, you have the X -- the Y file in existence and then a separate file, the X file, is being created from the delta file; correct?
>
> A. Yes.

> Q. And these references *indicate which blocks need to be copied* from the Y file to the X file; correct?
>
> A. Yes.
>
> Q. In fact, the references *instruct the system in terms of which blocks in Y need to be copied* to the X file; corre*ct*?
>
> A. Yes.

A1346–50 (emphases added).

Clouding argues that the Board erred because it analyzed "(unclaimed) operations at a receiving computer" rather than focusing on "the limitations recited in the challenged claims." Br. 30. But this argument misses the point. The operation at the receiving computer reveals the command that performed it. *Cf. Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002) ("Software is a set of instructions, known as code, that directs a computer to perform specified functions or operations."). Therefore, when *Williams* discloses a computer operation copying data at the receiving computer, it discloses a "command to copy."

Clouding next contends that "writing a command . . . to copy" requires a discard-by-default scheme, and *Williams* cannot be anticipatory because it is equally likely that *Williams* uses a retain-by-default scheme. Br. 30–31. However, as the Board explained, *Williams* identifies the blocks of Y (the old file) that are to be retained (as opposed to the blocks to be discarded), and this is "characteristic of a discard-by-default scheme, nullifying Patent Owner's argument that *Williams*

just as likely could be using a retain-by-default scheme." A23–24; *see also* A891. Clouding states, "This is simply not true," Br. 30, but conclusory statements do not rebut the Board's factual findings.

Clouding misconstrues *Williams* as "*modify*[*ing*] the old version of Y so it becomes a replica of X." *See* Br. 32. *Williams* discloses "reconstruct[ing] X from Y and D," and states that the references in the difference file can be looked up "either in Y or in the part of X already reconstructed." A869, 19:66–20:5. If *Williams* simply taught overwriting Y itself as Clouding argues, the specification would not *separately* refer to "Y" and "X . . . reconstructed" because they would be the same file—i.e., Y would be modified to become X.

*Williams* provides yet further evidence that *Williams* does not overwrite the old version of the file (Y)—thereby supporting the Board's conclusion that the update file (D) uses a copy command resulting in two separate files. *Williams* discloses that E2 can "retain copies of *all the previous versions of the file*." A870, 21:62–65 (emphasis added). The Board concluded, "This means that computer E2 should maintain both versions of the file, Y (the previous version) and X (the current version) when generating the current version." A15. And this makes perfect sense. A file backup system designed to retain *all* versions of a file—like *Williams*—would not implement a scheme that saved new versions of a file

directly over top of a previous version of that file; this would cause the previous version to be lost. *See* A915. Clouding ignores this evidence.

The aforementioned portions of *Williams*, both alone and in combination, provide substantial evidence supporting the Board's factual finding that *Williams* discloses "writing a command . . . to copy."

### 2.    *Williams* Combined with *Miller* Renders Obvious "Writing a Command . . . to Copy"

*Williams* and *Miller* render obvious claims 5–10 and 16–21. In addressing this combination, Clouding makes the same argument that it made for Williams alone. Br. 39. Therefore, Clouding's argument should be rejected for the reasons discussed above. *See supra* § V.C.1.

However, even if *Williams* lacked a "command . . . to copy"—which it does not—*Miller* discloses such a command. Clouding admits it: "Miller teaches a command to copy. There's no dispute about that." A458:4–5; *see also* A184; Br. 40. And because there were only two options for synchronizing files—another point conceded by Clouding, A450:7–A451:4—updating a file by copying an old version of the file and modifying it (as opposed to modifying the old file directly as Clouding incorrectly characterizes *Williams*), "would have been obvious for a skilled artisan to try." A32–33; *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). The combination of *Miller*'s command to copy with *Williams*'s teachings would have involved nothing more than the combination of "familiar

32

elements according to known methods . . . [to] yield predictable results." *KSR*, 550 U.S. at 416.

Clouding does not and cannot argue that *Williams* and *Miller* lack any of the features of claims 5–10 and 16–21. Instead, Clouding asserts that an ordinarily skilled artisan would not combine *Miller*'s command to copy with the teachings of *Williams* because *Williams* does not use a copy command, and *Miller*'s copy command would allegedly increase the size of *Williams*'s update file, which would be contrary to *Miller*'s teaching of having the smallest possible update file. Br. 40– 42.

*Miller* uses a copy command *for the very purpose* of minimizing the size of the update file. Prior to disclosing the use of a copy command, *Miller* states that "[w]hat is needed is a method and system for generating a difference file from an old file and a new file, where that difference file indicates, in minimal number of bytes, changes between the old file and the new file." *See* A799, 2:21–24. *Miller* then states, "In general, copy and insert commands are selected in order to produce the smallest final DIFF file." A802, 8:42–44; *see also* A1343:3–A1344:14. Therefore, if anything, *Miller* teaches *toward* using a command to copy, and an ordinarily skilled artisan would have found it obvious to modify *Balcha* to include such a command. The Board correctly held that "Miller's stated objective for its

own invention cannot be read to eliminate a key element of its invention that is used for achieving the very same objective." A233–34.

Accordingly, it would have been obvious to combine *Williams* and *Miller*, and such a combination renders obvious claims 5–10 and 16–21.

### 3. An Ordinarily Skilled Artisan Would Have Found It Obvious to Combine *Miller*'s "Command . . . to Copy" with *Balcha*

The Board concluded that claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31 were unpatentable on another ground: the combination of *Balcha* and *Miller*. A31-33. Clouding's arguments for *Balcha* and *Miller* largely mirror its arguments for *Williams* and *Miller*, and should be rejected for similar reasons.

Clouding contends that *Balcha* does not copy the file and therefore "has no need for and does not write a copy 'primitive' (or any other instruction) into the delta file to effect the copying of data from the old version of the file into the new version of the file." Br. 18. But this argument—that *Balcha* does not need a command to copy because *Balcha* does not create a copy of the file—is circular and does not address the real issue: whether combining a command to copy with *Balcha* would have been obvious.

As noted above and as found by the Board, there were limited options for synchronizing two files, and using a command to copy as opposed to modifying the old file directly "would have been obvious for a skilled artisan to try." A32–33;

*see also KSR*, 550 U.S. at 416; *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1331 (Fed. Cir. 2009) (finding invention obvious to try because "[t]here was thus a 'finite number of identified, predictable solutions' to suggest that the . . . patent's methods would have been obvious to try" (quoting *KSR*, 550 U.S. at 421)). Combining the copy command of *Miller* with *Williams* also would have been obvious because it would have retained the old version of the file, thus ensuring that the conversion was successful or other user applications were compatible with the revised file before deleting the previous version. A903–04.

Clouding argues that combining *Miller*'s command to copy with *Balcha* would increase the size of the update or "DIFF" file, which would be contrary to *Miller*'s teaching to have the smallest possible DIFF file. Br. 49–50. But as noted previously, *Miller* disclosed a command to copy for the very purpose of minimizing the size of the update file. *See* A799, 2:21–24; A802, 8:42–44; *see also* A1343:3–A1344:14. Moreover, an ordinarily skilled artisan would not have avoided copy commands due to their size. *See* A903–04. As the '799 patent concedes: "The size of the copy command is negligible in comparison to the size of the segment to which it pertains." A62, 4:11–15.

Finally, Clouding argues that "execution of the 'copy' primitive within the process of Balcha would require the coping [sic] of data into the updated file that was already included within the file, thereby causing redundant data to be

unnecessarily and illogically added to the updated version of the file." Br. 50. This argument presents a straw man. Copying an old version of the file would have been an obvious alternative to modifying the old version of the file itself. Neither the Board nor Unified stated that both should be done together.

For at least these reasons, *Balcha* and *Miller* render obvious claims 1, 5, 9, 10, 12, 16, 20, 21, 23, 24, 30, and 31.

### 4.    "Writing a Command . . . to Copy" Also Would Have Been Obvious in View of the Combination of *Miller*, *Balcha*, and *Freivald*

For dependent claims 6–8 and 17–19 and the combination of *Balcha*, *Miller*, and *Freivald*, Clouding makes the same arguments that it made with respect to *Balcha* and *Miller* (e.g., that an ordinarily skilled artisan would have avoided a copy command due to its size), Br. 52–53, and those arguments fail for the same reasons explained above, *see supra* § V.C.3.

Clouding also suggests that the combination of *Miller*, *Balcha*, and *Freivald* would involve including the "entire copy of the subject Web page" in the difference file. Br. 52–53. Unified, however, did not rely upon *Freivald* for its disclosure of sending entire HTML files; it relied on *Freivald* for its disclosure of determining if the client computer has a latest version of a file by determining whether that file has been altered—a point that Unified already explained when

Clouding raised this same argument before the Board. A356. Clouding's argument is irrelevant and should be rejected.

> **D.   The Board Correctly Concluded that Claims 37 and 42 Are Unpatentable, Rejecting Clouding's Argument that the Prior Art Lacks "Determining Whether the Second Computer Has a Latest Version of a File"**

The Board found claims 37 and 42 unpatentable as anticipated by *Williams*, anticipated by *Balcha*, and obvious over *Balcha* and *Freivald*. In each instance, the Board concluded that the prior art disclosed "determining whether the second computer has a latest version of a file."

> **1.   *Williams* Discloses "Determining Whether the Second Computer Has a Latest Version of a File"**

Substantial evidence supports the Board's factual finding that *Williams* discloses "determining whether the second computer has a latest version of a file." A26. *Williams* discloses comparing a hash of file Y (located at a second computer E2) against a hash of file X (located at a first computer E1). *See* A869, 19:45–49. If the hash of X does not match the hash of Y, then the system has determined that file Y is no longer the latest version of the file, and an update is generated. *Id.*; *see also* A870, 21:36–38.

Because Clouding cannot dispute this disclosure from *Williams*, Clouding suggests that the Board improperly applied its claim construction for the "determining" limitation. According to Clouding, the Board construed the

"determining" limitation such that the first computer determines the "latest version of the file" to an absolute certainty, but then the Board disregarded the "absolute certainty" requirement when it applied its construction. Br. 36–37.

Clouding misstates the facts. The Board rejected Clouding's "absolute certainty" requirement *both* when it construed the claim phrase *and* when the Board applied its construction to *Williams*. There was no "change[]." *See* Br. 37.

In the claim-construction section of the Final Written Decision, the Board stated:

> Patent Owner appears to argue that the determining limitation requires the first computer to be *absolutely certain* that the version on the second computer is not the most recent version of the file. *See, e.g.*, PO Resp. 7–8 (arguing that claims 37 and 42 do not allow for the possibility that a more recent file would be overwritten by an older file), 38 (distinguishing prior art where "computer E1 cannot be certain whether or not computer E2 stores a latest version of the subject file").
>
> . . .
>
> In light of the considerations discussed above, *we do not see anything that would lead us to conclude that the proper construction of the determining limitation requires absolutely certainty*. From the perspective of the first computer, the latest version, as recited in claims 37 and 42, refers to the current version accessible by the first computer, as determined by the first computer at the time a check is made.

A9, A13–14 (emphases added).

The Board said the same thing when it *applied* the claim construction to *Williams*: "As explained above, our construction of the determining limitation does not require absolute certainty that the current version is the latest version." A26. The Board consistently and correctly rejected Clouding's "absolute certainty" argument. *See also supra* § V.B.

Continuing with a variation of the same argument, Clouding contends that *Williams*'s computer E1 "cannot be certain whether or not computer E2 stores a latest version of the subject file." Br. 37. Clouding cites its expert declaration for support, *id*., which parrots the conclusory language used in the brief, A1829. Clouding also notes that "E1 includes an MD5 digest," thereby "accommodating situations in which computer E2 may store a different, but not necessarily a latest, version of a file than computer E1." Br. 38.

Each of Clouding's arguments relies on the same misapplication of the Board's claim construction requiring absolute certainty that the current version is the latest version. The "absolute certainty" requirement cannot be correct because the '799 patent does not support an application of the "determining" step involving the *absolute* latest version of the file. *See supra* § V.B. This is highlighted by Clouding's own hypothetical, where the first computer receives a second update (where the change was made later) prior to receiving a first update (where the change was made earlier) due to network latency. A463:4–A464:9. Under such a

hypothetical, "[t]here is no disclosure in the '799 Patent indicating that an evaluation made by the first computer, in the time between receiving the first and second updates, would result in a determination that the second update was the latest version." A12.

Rather, like *Williams*, the '799 patent "us[es] the detection of a change to a file to determin[e] whether a second computer has a latest version of a file." A1303–04. During the oral hearing, Clouding attempted to distinguish the '799 patent from the prior art by suggesting that the '799 patent uses time stamps to decipher which file is the "latest version." A461:1–14. But the use of time stamps—even if supported by the '799 patent—does not distinguish the '799 patent from *Williams* because *Williams* also uses time stamps, A869, 19:47–49; A870, 22:10–14—a fact identified by Unified at the oral hearing, A473:7–20, noted by the Board in its Final Written Decision, A26, and ignored by Clouding in its opening brief, *see* Br. 35–39.

Accordingly, *Williams* provides substantial evidence of "determining whether the second computer has a latest version of a file," and the Board's decision to cancel claims 37 and 42 as unpatentable should be affirmed.

### 2.    *Balcha* Discloses "Determining Whether the Second Computer Has a Latest Version of a File"

The Board also correctly found that *Balcha* discloses "determining whether the second computer has a latest version of a file," thereby anticipating claims 37

and 42. In particular, *Balcha* discloses a first computer (e.g., server 22) determining that a second computer (e.g., server 24) does not have a latest version of a file (e.g., server 22 determines that file 21 has been modified, so file 27 needs to be updated to mirror file 21). A777, 4:60–67; A772, Fig. 1 (reproduced below).



FIG. 1

Clouding asserts that the '799 patent differs from *Balcha* because *Balcha* merely detects whether the file has changed, irrespective of the timing of the change. Br. 43–44. However, the "latest version of the file" *is* the changed file: that is why it is the "latest" as opposed to the "old" version. Clouding's expert conceded that base file 21 would be the "latest" version of the file when faced with Figure 1 of *Balcha* and the sequence described in column 4, lines 60–67[4] (the attorney presented the sequence as a "hypothetical"):

---

[4] "Either base file 21 or 27 can be modified at either server. *Upon detection of a modification to the file*, the detecting server, for example server 22, uses the respective base signature file, for example, base signature file 20, to generate a new delta file, and communicates the delta file over network 26 to server 24. *Server 24 then uses the delta file to update the base file 27*, and recalculates the base signature file 28." A777, 4:60–67 (emphases added).

41

Q. Well, in my hypothetical, sir, the file is stored on server and client as 21 and 27 in figure 1. Do you see that?

A. Yes.

Q. Okay. And in my hypothetical, 21 and 27 are the same.

A. Yes.

. . .

Q. Then 27 remains the same but 21 is updated.

A. Yes.

. . .

Q. At that point in time, the change to 21 renders that file the latest version; correct?

A. Are you assuming that there are no other clients in the entire system?

Q. I'm assuming just what's in front of us, sir, that there's 21 and 27 --

A. Yes.

Q. -- with a client and a server. So the answer to my question is in those circumstances, when the server detects the change to 21, is 21 the latest version of the file?

A. Yes.

Q. And in those circumstances, 27 would not be the latest version of the file; correct?

A. Yes.

A1322:5–A1323:13 (objections of counsel omitted).

42

In the event that Clouding belatedly raises its hypothetical configurations where file 21 is not the "latest" file, those fail as well. Clouding's hypothetical configurations import undisclosed features into *Balcha*'s Figure 1, such as "other storage locations," A1322:2–4, and "multiple updates happening simultaneously," A1321:17–19. Clouding's newly added disclosure cannot render *Balcha* nonanticipatory. And even if Clouding's hypotheticals are accepted as situations that might occur, it is the disclosure where *Balcha* anticipates the claims that matters. *See Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1380 (Fed. Cir. 2005) ("The fact that another embodiment is disclosed does not detract from the remainder of the disclosure."); *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003) ("[A] prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention.").

Moreover, Clouding's hypothetical configurations only have meaning if the Court takes the additional step of overturning the Board's construction for the "determining" limitation to make it require the *absolute* "latest" version of the file—a construction argument rejected by the Board, A9–14, and waived by Clouding, *see supra* § V.B. With respect to the "determining" feature, the '799 patent and *Balcha* are identical: "Both use the detection of a change to a file to determine that the newly changed file is the latest version of the file." A1300–01.

The '799 patent method itself cannot be *absolutely* certain that it has determined the "latest" version of a file. *See supra* § V.B.

For at least these reasons, substantial evidence supports the Board's factual findings, and *Balcha* anticipates claims 37 and 42.

### 3. *Balcha* and *Freivald* Also Render Obvious "Determining Whether the Second Computer Has a Latest Version of a File"

In addition to being anticipated by *Williams* and separately anticipated by *Balcha*, claims 37 and 42 are also rendered obvious by *Balcha* and *Freivald*. Clouding's only argument is that "Freivald simply fails to mention" the "determining" step. Br. 45. According to Clouding, *Freivald* sends notifications when it detects modifications to webpages "regardless of whether the modifications reflect the latest version of the file or not." Br. 45–46.

Once again, Clouding's argument relies on the same faulty premise that the Board's construction for the "determining" limitation requires the *absolute* latest version of the file. *See supra* § V.B; A13–14. With Clouding's improper premise dispelled, there is no debate that *Freivald* discloses "determining whether the second computer has a latest version of a file." In particular, *Freivald* discloses a change-detection server or "minder," which, without interaction with a client computer, determines whether the client computer has the most recent version of a webpage document. *See* A824, 6:63–66 (comparing "the archived [signature files]

in database 16 to new [signature files] of the fetched documents to determine if a change has occurred"). Therefore, *Freivald*, like *Balcha*, discloses "determining whether the second computer has a latest version of a file."

### E. The Board Correctly Denied Clouding's Motion to Amend Because Clouding Failed to Carry Its Burden to Establish the Patentability of Its Proposed Substitute Claim

As the movant, Clouding bore the burden of establishing the patentability of its proposed substitute claim. *See* 37 C.F.R. § 42.20(c). However, Clouding's Motion to Amend failed to address the prior art of record, and it failed to address why combining the amended feature with the other claim elements would have been nonobvious. Therefore, the Board was correct to deny Clouding's motion.

Clouding bore the burden of establishing the patentability of its proposed claim over the "prior art of record." *See Proxyconn*, 789 F.3d at 1307. The "prior art of record" includes: (1) "any material art of record in the current proceeding, including art asserted in grounds on which the Board did not institute review"; (2) "any material art of record in any other proceeding before the [PTO] involving the patent"; and (3) "any material art in the prosecution history of the patent." *MasterImage 3D, Inc. v. RealD Inc.*, IPR2015-00040, 2015 WL 4383224 (PTAB July 15, 2015). In its pre-motion Order (*see Unified Patents, Inc. v. Clouding IP, LLC*, IPR2013-00586, Paper 16, at 5 (PTAB May 8, 2014)), the Board directed Clouding to *Idle Free Systems, Inc. v. Bergstrom, Inc.*, IPR2012-00027, Paper 26

(PTAB June 11, 2013), which states: "The burden is not on the petitioner to show unpatentability, but on the patent owner to show patentable distinction over the prior art of record and also prior art known to the patent owner," *id*. at 7. A plain reading of "over the prior art of record and also prior art known to the patent owner" described in *Idle Free*—even if read without the benefit of the Board's recent *MasterImage* decision—would encompass prior art beyond the *inter partes* review proceedings.

Notwithstanding the Board's guidance, Clouding limited its patentability analysis to prior art from "this proceeding" and from the field of "file backup"— addressing only *Williams* with a passing reference to *Balcha*. A336–39. That was not enough. By rule, Clouding had to demonstrate entitlement to the relief that it sought. 37 C.F.R. § 42.20(c); *Cf. Prolitec, Inc. v. Scentair Techs., Inc.*, No. 2015-1020, 2015 WL 7873637, at *7 (Fed. Cir. Dec. 4, 2015) (finding it reasonable to require the patentee to show patentability over prior art from the patent's original prosecution history). Clouding's decision to limit its patentability analysis to the art in "this proceeding" and solely to the field of "file backup" disregarded the Board's instructions to be forthcoming in its prior-art analysis or risk a deficient motion. *See* A268.

Clouding's deficiency is important because claims amended during an *inter partes* review proceeding are "added directly to the patent, without examination."

*Idle Free Sys., Inc. v. Bergstrom, Inc.*, IPR2012-00027, 2014 WL 824156, at \*19

(PTAB Jan. 7, 2014). As this Court stated in *Proxyconn*:

> During IPRs, once the PTO grants a patentee's motion to amend, the substituted claims are not subject to further examination. Moreover, the petitioner may choose not to challenge the patentability of substitute claims if, for example, the amendments narrowed the claims such that the petitioner no longer faces a risk of infringement. *If the patentee were not required to establish patentability of substitute claims over the prior art of record, an amended patent could issue despite the PTO having before it prior art that undermines patentability.* Such a result would defeat Congress's purpose in creating IPR as part of "a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs."

789 F.3d at 1307–08 (emphasis added) (quoting H.R. Rep. No. 112-98, pt. 1, at 40

(2011), *as reprinted in* 2011 U.S.C.C.A.N. 67, 69). It is also important for the

patent owner to address prior art beyond the petition because "Petitioner cannot be

expected to select the closest art for the proposed additional limitation when

Petitioner could not have predicted the limitation(s) Patent Owner would opt to add

to proposed claim amendments." *See* A39–40. Accordingly, Clouding's decision to

improperly constrain its analysis was a material error.

Clouding advances a straw man that it was not required to "know of all

pre-existing prior art," Br. 58 (quoting A39), and "address art of which it was

unaware," Br. 60. Nobody ever argued that it was. The Board said exactly the

opposite: "Patent Owner is not expected to know of all pre-existing prior art." A39.

47

What Clouding could not do was limit its analysis to "this proceeding" and the field of "file backup," which is what it did.

Clouding's motion also failed because Clouding did not address obviousness, notwithstanding direction from the Board to do so. A267–68. Clouding's motion did not once discuss relevant Supreme Court, Federal Circuit, or Board precedent. Nor did Clouding explain "why one with ordinary skill in the art would not have reason to combine feature Z . . . with features A-Y to form an invention including features A-Z," as suggested by the Board. A268. Clouding contends that its motion "explain[ed] that the proposed claim was not known in the art, . . . identifying specifically how the art being cited in the proceeding did not meet the limitations." Br. 59–60. But "known in the art" only addresses novelty, not obviousness, and there is considerable evidence that the proposed claim is obvious.

For example, Clouding conceded that file segmentation was known "many decades" prior to the '799 patent for the general purpose of "cop[ying] with low bandwidth transmission links that interconnected the computers." A336. *Williams* describes using statistics to determine file segment division points. A866, 14:31–34 (the variable p "*is the inverse of the probability* of placing a boundary at an arbitrary position in a randomly generated block of data, and can be set to any

integer value in [0,65535]" (emphasis added)); *see also* A1284–88.[5] And Clouding

admitted that optimization of segment sizes was known. A338 ("[O]ptimum

segment sizes were usually determined on the basis of available bandwidth on a

network link, or enabling rapid comparisons of segments.").

With file segmentation, file segmentation based on statistics, and

optimization of segment sizes all known, Clouding's motion never explained why

"segment delimiters that are statistically determined to be optimal division points

for the segments" would have been a nonobvious addition to claim 42. Instead,

Clouding addressed *Williams* for anticipation, A337–38, and generically argued

that the newly added feature was not taught or suggested by the references in "this

proceeding." But neither of these arguments addressed whether the proposed

claim, including its "new" file-segmentation feature, would have been nonobvious.

The failure to do so was fatal to Clouding's motion.

For at least these reasons, Clouding failed to carry its burden for its Motion

to Amend, and the Board's decision should be affirmed.

## VI.    CONCLUSION

The Court should affirm the Board's decision.

_____

[5] Unified also explained in its Opposition to Clouding's Motion to Amend that *Williams* anticipates the proposed substitute claim, as does U.S. Patent No. 6,076,084 to Harlan. *See e.g*., A368-76; A1284-94.

Respectfully submitted,

/s/ Daniel C. Cooley

James R. Barney

FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP

**Of Counsel:**

901 New York Avenue, NW

Washington, DC 20001

Jonathan Stroud

(202) 408-4000

UNIFIED PATENTS INC.

1875 Connecticut Avenue, NW

Floor 10

Washington, DC 20009

Daniel C. Cooley

(202) 805-8931

FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP

Two Freedom Square

11955 Freedom Drive

Reston VA 20190

(571) 203-2778

December 18, 2015

*Attorneys for Appellee Unified Patents Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing BRIEF OF APPELLEE UNIFIED PATENTS INC. were served upon registered counsel by operation of the Court's CM/ECF system on this December 18, 2015:

_____/s/ Kay Wylie_____
Kay Wylie
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
Telephone: (202) 408-4000

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing BRIEF OF APPELLEE UNIFIED PATENTS INC. contains 11,021 words as measured by the word-processing software used to prepare this brief.


Dated: December 18, 2015              Respectfully submitted,


_____/s/ Daniel C. Cooley_____
Daniel C. Cooley
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
*Attorney for Appellee Unified Patents, Inc.*